### Connie Rae KUNDA

#### v.

**MUHLENBERG COLLEGE, John H. Morey, Individually and in his official capacity as President of Muhlenberg College, Philip B. Secor, Individually and in his official capacity as Dean of Muhlenberg College, Harold L. Stenger, in his official capacity as Dean of Muhlenberg College,**

**Muhlenberg College, Appellant.**

#### No. 79–1135.

United States Court of Appeals, Third Circuit.

Argued Oct. 16, 1979.

Decided Feb. 19, 1980.

David M. Rabban, Washington, D. C., for amicus curiae American Ass'n of University Professors; Victor J. Stone, Champaign, Ill., Mary Gray, Washington, D. C., of counsel.

Issie L. Jenkins, Joseph T. Eddins, Beatrice Rosenberg, Paul E. Mirengoff, Washington, D. C., for amicus curiae Equal Employment Opportunity Commission.

Christine Young Topping, Sheldon Elliot Steinbach, Washington, D. C., for amici curiae Nat. Institute of Independent Colleges and Universities, the American Council on Ed., and the Ass'n of Governing Boards of Universities and Colleges.

Harry Reagan, Roberta S. Staats (argued), Philadelphia, Pa., for appellants; Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.

Michael L. Golden (argued), Roy Yaffe, Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, GARTH and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

This case raises significant questions regarding the application in an educational setting of the statutory provisions prohibiting discrimination on the basis of sex and the appropriate relief to be awarded when discrimination has been proven.

Connie Rae Kunda, an instructor in the Department of Physical Education at Muh-

lenberg College in Allentown, Lehigh County, Pennsylvania, brought this action under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* (1976), alleging that Muhlenberg had discriminated against her on the basis of sex when it failed to promote her and denied her tenure.[1] Kunda sought an injunction requiring Muhlenberg to appoint her as an Associate Professor of Physical Education with tenure, backpay, and costs and attorneys' fees.

After a trial on the merits, the district court found that Muhlenberg discriminated against Kunda on the basis of sex. In its Order of October 19, 1978, amended November 17, 1978, the court ordered that Muhlenberg grant Kunda (1) reinstatement; (2) backpay, from the date of termination, less amounts earned in the interim; (3) promotion to the rank of Assistant Professor effective September, 1973; and (4) the opportunity to complete or substantially complete the requirements of a master's degree within two full school years from the date of the Order and, if the master's degree is successfully achieved, an award of tenure effective September, 1975. *Kunda v. Muhlenberg College*, 463 F.Supp. 294 (E.D.Pa.1978). Muhlenberg has appealed. For the reasons that follow, we affirm the Order of the district court.

## II.

The procedure for awarding of promotion and granting of tenure at Muhlenberg at the time in question was set forth in the Muhlenberg College Bylaws and the Muhlenberg College Faculty Handbook. Normally, the Department Head initiates the action with regard to promotion and/or tenure of a faculty member in his or her department by submitting to the Dean a written recommendation. This recommendation is forwarded by the Dean to the Faculty Personnel and Policies Committee, hereinafter "FPPC", composed of six elected faculty members, which has the responsibility, *inter alia*, of reviewing recommendations concerning promotion and/or tenure submitted by the Department Head and making and submitting its own recommendation to the President of the College. The three recommendations, that of the Department Head, the FPPC, and the independent recommendation of the Dean, are reviewed by the President who must make his own recommendations to the Board of Trustees Committee on Educational Policies and Faculty Affairs, hereinafter "Trustees Committee." The Trustees Committee reports to the full Board of Trustees, which is vested with the power to award promotion and grant tenure.

The exhibits show that in practice the Board of Trustees, at least since 1970, invariably followed the President's recommendations, granting tenure on his recommendation and similarly denying it when he recommended against it, even when there were contrary recommendations by the Dean or FPPC. The same was true for promotions. There is one additional procedure available to those faculty members who wish to appeal from adverse decisions regarding promotion and/or tenure. There is a Faculty Board of Appeals, hereinafter "FBA", created by the Board of Trustees on November 5, 1973, composed of seven non-administrative faculty members and three alternates elected by the faculty, which can consider the appeals of individual teaching-faculty members pertaining to questions of

1. In addition to the count alleging a claim under Title VII, the complaint contained three additional counts alleging claims for civil rights conspiracy in violation of the Civil Rights Act, violation of the Equal Pay Act, 29 U.S.C. § 206(d), and various pendent state claims. Three individual defendants, John H. Morey, Philip Secor, and Harold Stenger, all college officials, were named in the counts dealing with the alleged civil rights conspiracy and the state claims. By Order of April 20, 1978, the district court granted defendants' motion for summary judgment on all of the counts other than that under Title VII and dismissed the individual defendants. Plaintiff filed a cross-appeal from the dismissal of the civil rights conspiracy claim, but this cross-appeal was dismissed on plaintiff's motion on the authority of *Great American Federal Savings and Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Thus the only defendant-appellant remaining is Muhlenberg College.

promotion and tenure and then make its own recommendation to the President. Thus, in effect, there are two separate faculty committees which independently review a candidate's credentials and performance and which make recommendations to the President on behalf of the faculty members of the College regarding promotion and tenure.

The faculty ranks at Muhlenberg are Professor, Associate Professor, Assistant Professor, Instructor, and Lecturer. The policy for promotion, as set forth in the Faculty Handbook, is:

Promotion Requirements

Promotion is awarded for meritorious service to the College. For promotion to Professor or Associate Professor, the Ph.D. or its scholarly equivalent or recognized achievement in a field shall be required. These requirements normally apply to the rank of Assistant Professor also, although this rank may be obtained without the Ph.D. if there is sufficient evidence of progress toward the completion of all requirements for the degree.

For faculty members in the Physical Education Department, the terminal degree for purposes of tenure and promotion is the master's degree.

The Faculty Handbook does not articulate the requirements for tenure as it does for promotion. The President of the College testified that the academic qualifications for the grant of tenure were similar to those published for promotion, i. e. possession of the terminal academic degree or its scholarly equivalent or recognized achievement in the field.

A college's policy for tenure and promotion often encompasses not only the qualifications needed but also the time schedule in which a candidate must show achievement of the necessary credentials. In the case of promotion to Assistant Professor, the rank relevant in this case, the Faculty Handbook provides that "no person may remain indefinitely at the rank of Instructor although contracts as Instructor may be renewed annually for no more than nine years."

The relevant Faculty Handbook provision regarding tenure is:

Tenure is granted only by action of the Board of Trustees upon recommendation of the President. A faculty member shall obtain continuous tenure upon reappointment after seven years' full-time college or university teaching at the rank of Instructor, Assistant Professor or Associate Professor, at least four of which shall have been at Muhlenberg. Not more than three of the total seven years shall be served at the rank of Instructor. No person, however, shall teach at Muhlenberg for more than nine years without obtaining tenure.

Although there were different interpretations as to the meaning of the above provision, the President testifying that a faculty member must have served at least four years at a professional rank, i. e. above Instructor, before entitlement to tenure and a contrary position taken by the faculty member who helped draft the policy, the trial court found that the Board of Trustees retained the power to grant tenure to a faculty member who had not served at a professional rank for four years.

### III.

Connie Rae Kunda was appointed as an instructor in the Department of Physical Education of Muhlenberg College in September 1966, a position she held until June 1975 following annual reappointments. At the time Kunda was hired she had a Bachelor of Arts degree in Physical Education. The trial court found that at the time she was hired she was not told a master's degree was needed for employment or advancement at the College.

At all relevant times, Raymond Whispell was the Chairman of the Physical Education Department, Philip B. Secor was the Dean, and John H. Morey was the President of Muhlenberg.

The first recommendation of Kunda for promotion occurred on October 14, 1971 (her fifth year on the faculty) when Professor Whispell wrote to Dean Secor recommending that she be promoted to Assistant Pro-

fessor. Kunda's name was sent to the FPPC which divided equally on whether to recommend her promotion. Dean Secor did not recommend Kunda for promotion. President Morey also did not recommend the promotion, testifying that he considered the FPPC tie vote to be a failure to recommend promotion. At the request of Professor Whispell the FPPC reconsidered the Kunda promotion at its March 15, 1972 meeting. Dean Secor, who did not usually attend such meetings of the FPPC, spoke in opposition, stating that the future of the Physical Education Department was doubtful and that the decision to promote Kunda should be made at a later date. Thereafter, the FPPC voted not to recommend the promotion by a vote of 4 (no) to 2 (yes).

In the spring of 1972, in an effort to ascertain the reasons for denial of the promotion, Kunda met separately with Professor Whispell, Dean Secor and President Morey. The trial court found that:

> None of those persons told Mrs. Kunda that she was not promoted because she lacked a masters degree, or stated that a masters degree would be mandatory in order for her to be promoted or considered for tenure in the future.

The following academic year, 1972–73, Professor Whispell again initiated the promotion process by sending a written recommendation to Dean Secor on October 5, 1972 that Kunda be promoted to Assistant Professor. Although all but one of the other recommendations were timely forwarded by Dean Secor to the FPPC, Dean Secor wrote to the FPPC that due to an "egregious oversight", he had failed to bring the promotion recommendation of Kunda to the FPPC's attention when it was considering the other tenure and promotion decisions. By this time, Dean Secor had forwarded all of his recommendations to President Morey, President Morey had in turn forwarded his recommendations for granting promotions to the Board of Trustees, and the Board of Trustees had already approved all of President Morey's recommendations.

At its meeting of January 25, 1973 the FPPC unanimously recommended Kunda's promotion. The FPPC noted "that despite the lack of an advanced degree, Mrs. Kunda provide[d] a vital service in the athletic program and, in fact, does have training beyond the Baccalaureate level." The FPPC recommendation was forwarded to President Morey.

Dean Secor recommended that Kunda not be promoted. His letter to President Morey of February 13, 1973 contained the following comments:

> Concerning Mrs. Kunda, I have considerable difficulties. I cannot recommend that she be promoted because she holds only a Bachelor's degree. If she held a Master's degree I would certainly recommend her promotion on the strength of the known excellence of her work at the College. She is an outstanding teacher in her area, has made fine contributions within the Physical Education Department, and has been a dedicated and loyal member of the faculty.
>
> The problem here obviously is that under our present regulations if Mrs. Kunda is not promoted she cannot receive tenure for she will have too many years in rank as an Instructor. I would suggest considering some option whereby Mrs. Kunda might be appointed as Lecturer in the faculty, thereby removing her from consideration for tenure. It would be a pity to have to abandon our work in modern dance and, indeed, to have to turn Mrs. Kunda loose when she does such a fine job for us, simply because of ridiculous and outdated tenure policy. I would hope that we might work out a new kind of relationship with Mrs. Kunda so that we could keep her in our employ as long as this is mutually to her advantage and ours.

President Morey did not recommend Kunda's promotion to the rank of Assistant Professor that year, and she was not promoted.

During the next academic year, once again Kunda's Department Chairman, Professor Whispell, this time joined by all senior members of her department, wrote to Dean Secor by letter dated October 2, 1973

recommending that Kunda be promoted and also, for the first time, recommending that she be granted tenure. The FPPC unanimously concurred by a vote of 6 (yes) to 0 (no). The FPPC found Kunda was an excellent teacher who had developed several new courses, participated in numerous professional organizations related to her specialty of dance, taken some post-graduate courses, published in her field, and presented a television series on physical fitness. The FPPC statement concluded:

> It seems to us that the usual requirement for the Ph.D. does not apply in this case. We should instead measure the professional performance of Mrs. Kunda in teaching physical education at Muhlenberg, participating in professional groups as an officer or as a member, continuing her professional development by attending post-graduate courses and demonstrating her competence before the local audience on Channel 39 TV.

Once again, Dean Secor forwarded to the President a negative recommendation, this time as to tenure. He acknowledged that Kunda's "performance justifies a permanent appointment," but cited as the basis for his position the high percentage of tenured faculty in the Physical Education Department and the uncertainty of the Department's future at Muhlenberg. Dean Secor's memo did not refer to Kunda's lack of a terminal degree.

President Morey did not recommend Kunda's appointment to the Board of Trustees. Accordingly, she was notified that tenure had been denied and that she would receive a terminal contract for the 1974–75 academic year.

Kunda appealed the decision to deny her tenure to the FBA which referred her appeal to a three member subcommittee. The subcommittee unanimously recommended that Kunda be granted tenure and promoted to the rank of assistant professor. The full FBA adopted this recommendation, also

unanimously. It notified President Morey on January 20, 1975 that its recommendation was based on the fact that Kunda displayed the scholarly equivalent of a master's degree, that the policy of granting promotions only to those who had obtained the appropriate degree had been bypassed in the Physical Education Department with some frequency, and that there were no significant fiscal considerations which mandated the ultimate decision, since the abandonment of the Physical Education requirement did not seem to be a real possibility.

Upon receiving the FBA recommendation, President Morey invited Kunda to present her case at a meeting of the Trustee Committee. Morey prepared a memorandum for the meeting defending his refusal to recommend Kunda for tenure because she lacked a master's degree. After a hearing, the Trustees Committee voted not to grant Kunda tenure, and, in March 1975, the Board of Trustees adopted this recommendation. Kunda then initiated this action.

### IV.

The statute prohibits only "discrimination." Therefore, consideration of the practices of the college toward the plaintiff must be evaluated in light of its practices toward the allegedly more favored group, in this case males.

With respect to promotion, three members of the faculty of the Physical Education Department were promoted during the period of Kunda's employment notwithstanding their failure to have a master's degree. Professor Whispell, the department chairman, was promoted to full Professor effective September 1970, although he had only a bachelor of science degree. Ronald Lauchnor, hired as an Instructor in 1967, was promoted to Assistant Professor effective September 1972 even though he did not have a master's degree.[2] William

---

2. Prof. Whispell recommended the promotion of Lauchnor stating that Lauchnor had 43 credits toward his degree. In fact, Lauchnor had discontinued his studies toward a master's degree after earning 24 credits. Both President Morey and Dean Secor recommended Lauch-

Flamish was promoted to Associate Professor effective September 1972 although he did not have a master's degree. In departments other than Physical Education, Robert Bohm was promoted to Assistant Professor of Classics effective September 1972 although he lacked the terminal degree.

Central to the trial court's ultimate finding of disparate treatment was the difference in counseling received by male members of the Physical Education Department and by plaintiff. Although plaintiff had not been told of the necessity to have a master's degree either at the time of her initial employment at the college or by her department chairman, Dean, or President when she was being considered for promotion and tenure, male candidates for promotion and tenure were so advised. Dean Secor initiated a meeting with Ronald Lauchnor, a candidate for tenure about the same time as Kunda, and specifically advised him that he should obtain a master's degree because it was required for grant of tenure. Dean Secor encouraged him to pursue that degree. Dean Secor also initiated two meetings with Samuel Beidleman, an Instructor in the Physical Education Department, in the fall of 1967 and 1968 and advised him that a master's degree was a prerequisite to his tenure and promotion. A sabbatical leave had been offered to Robert Bohm, the professor in the Classics Department, so that he would be enabled to return to full-time doctoral study, which would have been required for him to obtain tenure.

## V.

The trial court found that the College discriminated against Kunda on the basis of her sex with respect to both the denial of promotion and the denial of tenure. The court found that plaintiff had satisfied both alternatives to the terminal degree requirement for promotion, in that she had the scholarly equivalent of the master's degree and recognized achievement in her field. Using the paradigm for such cases prescribed in *McDonnell Douglas v. Green*, 411

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1977), the court determined plaintiff established a prima facie case of violation of the statute with regard to Muhlenberg's failure to promote her to Assistant Professor. The court found that Muhlenberg's asserted reason for not promoting her, lack of a master's degree, was pretextual in view of its promotion of male members of the department who did not have masters' degrees.

The court used a different approach in considering the elements needed to make a prima facie case with regard to tenure. The court stated that:

> [D]ue to the unusual nature of the tenure decision and the undeniable fact that qualified faculty members may be denied tenure due to reasons relating to the needs of the college, we believe that an additional element must be shown in order to establish a prima facie case. Some courts have found this "additional element" in the existence of significant procedural irregularities in the tenure process. . . . We do not believe, however, that a showing of "procedural irregularities" is absolutely required. Alternatively a plaintiff may be able to show that males with similar qualifications were in fact granted tenure during the time period when plaintiff was being considered. In any case, where a plaintiff is able to demonstrate either or both of these "additional elements," a prima facie case is established.

463 F.Supp. at 308.

The court found that the "additional element" required to establish a prima facie case was present in this case. There was evidence of two procedural irregularities which occurred during consideration of plaintiff's candidacy for promotion and tenure. The first was the presence of Dean Secor at the FPPC meeting in March 1972 when he spoke against her candidacy, purportedly because of the uncertain future of the department, although he had "generally absented himself" from the FPPC meetings when there was a vote on tenure or promo-

---

nor's promotion, and the trial court found they "knew or should have known that [he] did not

have a master's degree and was not actively pursuing one."

tion. The second was the "egregious oversight" (Dean Secor's language) when he failed to forward Kunda's name to the FPPC with the other names to be considered for promotion. By the time her name proceeded through the steps to Board of Trustees' approval, the Board had already acted on the tenure and promotion of other candidates. The court accepted the conclusion of the FBA that Dr. Secor's oversight in failing to forward plaintiff's promotion recommendation at the proper time may have materially affected the decision not to recommend her promotion to the Board of Trustees.

In considering whether Kunda established a prima facie case for tenure, the trial court found that she was qualified for tenure as well as promotion. The court, "loathe to act as a 'super-tenure review committee'," noted that it was the "virtually unanimous opinion of those in a position to examine Mrs. Kunda's performance most closely, the Muhlenberg College faculty, that plaintiff was highly qualified for both promotion and tenure." However, the court found that the requirement that a faculty member possess the terminal degree in order to be granted tenure was uniformly applied by the College since the terminal degree requirement "was applied evenhandedly and in a nondiscriminatory manner. Since 1970, no faculty member at Muhlenberg has been granted tenure who did not possess a terminal degree." Therefore, by requiring that plaintiff possess a master's degree before being awarded tenure, Muhlenberg did not treat plaintiff less favorably than male members of her Department or other Departments. On the other hand, the court found that plaintiff was treated differently than male faculty members "in that she was never counselled that the failure to obtain a masters degree would preclude her from being considered for tenure." Since plaintiff could reasonably have believed that a master's degree was not an exclusive requirement for tenure and that she could qualify for tenure by meeting one or both of the alternate criteria listed in the Faculty Handbook, the court found that she was accorded disparate treatment.

It also found that such disparate treatment constituted purposeful discrimination on the basis of sex. The court noted that although plaintiff had a number of discussions with Dean Secor and President Morey concerning her future at Muhlenberg, neither utilized the available opportunity to tell her that he considered a master's degree was necessary for the award of tenure. Further, the court found that each knew that members of the faculty of that department might have believed a master's degree was not necessary in view of the treatment of Beidleman and Lauchnor. The court also noted that the statistical evidence submitted was relevant to the finding of discriminatory motive in the failure to adequately counsel plaintiff. The court found that if Kunda had been adequately counselled, she would have made every effort to obtain a master's degree. Finally, the court found that the College gave no convincing reason for the failure of its officials to inform Kunda of the necessity of obtaining a master's degree. Since the defendant articulated no reason for the disparate treatment, the court found plaintiff proved her case, and awarded the relief previously referred to.

## VI.

On appeal, Muhlenberg argues that the trial court erred in imposing on it the burden of persuasion to prove that the College's actions were based on legitimate and nondiscriminatory reasons and not on plaintiff's sex.

With respect to the court's conclusion as to discrimination against Kunda in failing to promote her, Muhlenberg claims that plaintiff failed to establish a prima facie claim because she was not qualified in that she lacked the objective qualification of a master's degree or sufficient evidence of progress toward the completion of all requirements for the degree. Further, appellant argues that the court was clearly erroneous in finding that Muhlenberg's stated reason that Kunda was not promoted because she lacked a terminal degree was pretextual.

Muhlenberg also argues that the trial court's finding in connection with the tenure denial that plaintiff was treated differently and less favorably than male faculty members by not being advised that the master's degree was an "absolute prerequisite for promotion or tenure" is clearly erroneous. Muhlenberg argues that the testimony shows that both Kunda and Lauchnor had precisely the same information concerning the qualifications for tenure, and that both determined not to pursue the master's degree but to rely on possession of its "scholarly equivalent". Appellant continues that if the proper burden of proof were allocated between the parties, and if plaintiff had been required to bear the burden of persuasion that she was not counseled as a result of purposeful discrimination on the basis of sex, then it would follow that there was no basis for the court's conclusion in plaintiff's favor.

Muhlenberg contends that plaintiff failed to adduce sufficient evidence to meet the burden of persuasion that the College's tenure decision was motivated by discriminatory animus. It claims that even if the court were correct in finding that Kunda had been counseled differently than male candidates, and even were this the result of discriminatory animus, the College remedied any detriment such lack of counseling might have caused Kunda by evaluating her for tenure on the basis of her possession of the scholarly equivalent of the degree, and denying tenure on that basis.

A group of national organizations and institutions have filed briefs amici curiae in this court directed to the sole issue of the appropriateness of the portion of the district court's order which granted tenure to plaintiff upon achievement of a master's degree within two years. Aligned with appellee for the position that the award of tenure was appropriate and does not infringe upon academic freedom are the American Association of University Professors, hereinafter "AAUP", and the United States Equal Employment Opportunity Commission. Taking the opposing position that the award of tenure as a remedy is a substantial departure from the pattern of remedies ordered in academic employment cases under Title VII and should not be sustained where there has been no finding that the tenure granting authority, in this case the Board of Trustees, acted in violation of Title VII are the National Institute of Independent Colleges and Universities, the American Council on Education, and the Association of Governing Boards of Universities and Colleges.

## VII.

The regimen to be followed in the proof of Title VII cases has now been explicitly prescribed by a series of Supreme Court decisions, and has been so frequently reiterated in lower court opinions and academic journals that it requires only brief recapitulation here. Claims of employment discrimination under Title VII may arise in two different ways. An individual may allege that she has been subjected to "disparate treatment" because of her sex, or that she has been the victim of a facially neutral practice having a "disparate impact" on her sex. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 581–82, 98 S.Ct. 2943, 2952, 57 L.Ed.2d 957 (1978) (Marshall, J., concurring in part). In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court set forth the applicable rules as to burden of proof in a "disparate treatment" case. In that case the claim was racial discrimination but the language is equally applicable to the claim of any group protected by Title VII.

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. . . .

The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.

*Id.* at 802, 93 S.Ct. at 1824 (footnotes omitted).

Of necessity, this cannot be an inflexible rule and the Court noted that:

[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.

*Id.* at 802 n.13, 93 S.Ct. at 1824 n.13. The inquiry must not end with the employer's statement of the reason for rejection. The Court continued:

[Employer's] reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of [employee], neither does it permit [employer] to use [employee's] conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand [employee] must, as the Court of Appeals recognized, be afforded a fair opportunity to show that [employer's] stated reason for [employee's] rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against [employer] of comparable seriousness to the "stall-in" were nevertheless retained or rehired. [Employer] may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races.

Other evidence that may be relevant to any showing of pretext includes facts as to the [employer's] treatment of [employee] during his prior term of employment; [employer's] reaction, if any, to [employee's] legitimate civil rights activities; and [employer's] general policy and practice with respect to minority employment. . . . On the latter point, statistics as to [employer's] employment policy and practice may be helpful to a determination of whether [employer's] refusal to rehire [employee] in this case conformed to a general pattern of discrimination against blacks. [citations omitted]. In short, on the retrial [employee] must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision.

*Id.* at 804–05, 93 S.Ct. at 1825 (footnotes omitted).

The Court again considered the method for pursuing the inquiry into proof of discrimination in *Furnco Construction Corp. v. Waters, supra,* where the Court commented that the method suggested in *McDonnell Douglas* :

is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. . . .

When the prima facie case is understood in the light of the opinion in *McDonnell Douglas*, it is apparent that the burden which shifts to the employer is merely that of proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race. . . . To dispel the adverse inference from a prima facie showing under *McDonnell Douglas*, the employer need only "articulate some legitimate, nondiscriminatory reason for the employee's rejection." 411 U.S. at 802 [93 S.Ct. at 1824].

438 U.S. at 577–78, 98 S.Ct. at 2929–2950.

In *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295 58 L.Ed.2d 216 (1978) (per curiam), a majority of the Court reaffirmed that the burden imposed upon the employer was only that of articulation of its reason for the disparate treatment:

While words such as "articulate," "show," and "prove," may have more or less similar meanings depending upon the context in which they are used, we think that there is a significant distinction between merely "articulat[ing] some legitimate, nondiscriminatory reason" and "prov[ing] absence of discriminatory motive." By reaffirming and emphasizing the *McDonnell Douglas* analysis in *Furnco Construction Co. v. Waters, supra*, we made it clear that the former will suffice to meet the employee's prima facie case of discrimination.

In its discussion of the governing legal principles in this case, the trial court correctly relied on both *McDonnell Douglas* and *Furnco.* The court quoted language from *McDonnell Douglas* that once a prima facie case of discrimination is made by plaintiff, the burden to articulate a legitimate, nondiscriminatory basis for its employment decision shifts to defendant. In the course of the trial court's reference to the *Furnco* decision, the court *quoted* some of the language of that opinion, including that previously referred to where the Court stated the defendant has the burden of "proving that he based his employment decision on a legitimate consideration." 438 U.S. at 577, 98 S.Ct. at 2950. Muhlenberg's counsel, honing in on this apparent misapplication of the appropriate burden, focuses on the distinction between the *articulation* of a nondiscriminatory reason and its *proof,*

and argues that the trial court committed the pervasive error of imposing on it the impermissible burden of persuasion.

■ An objective review of the trial court's opinion convinces us that it did not erroneously impose on Muhlenberg the burden of persuasion. If the language in the *Furnco* quotation was infelicitous, the responsibility was not that of the trial court.[3] In his exposition of the facts, the law, and his findings, the district court judge correctly followed the appropriate steps according to the direction of the three leading Supreme Court opinions (anticipating the *Sweeney* decision which followed soon after the court's opinion). After reviewing the detailed evidence submitted regarding disparate treatment, the court decided that plaintiff had established her prima facie case. Thereafter, in a section captioned "Rebutting the Prima Facie Case", the trial court stated that once the prima facie case is established "the burden shifts to the defendants to *articulate* a legitimate, nondiscriminatory basis for the employment decision in question. [citing *Furnco* and *McDonnell*]. In this case the legitimate nondiscriminatory reason advanced by defendants is the plaintiff's lack of a terminal degree." 463 F.Supp. at 309–10. (emphasis added). The court then discussed the reason advanced. It is therefore apparent that the court did not impose on defendant the burden of persuasion.[4] Moreover, the trial

---

**3.** Appellant also stresses the statement in a footnote of the opinion of the district court that "[w]ith respect to the defense that a nondiscriminatory reason for the employment action exists, the rule in this circuit is that the defendant bears the burden of persuasion on that issue. *Rodriguez v. Taylor*, 569 F.2d 1231, [1239] n.14 (3d Cir. 1977) *citing Ostapowicz v. Johnson*, 541 F.2d 394 (3d Cir. 1976)." As noted in the text, we find the district court did not misallocate the burden of persuasion to defendant in this case. Therefore, the reference to that burden in the language cited above is as harmless as was the reference to similar language in *Furnco*.

*Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978), was a case filed under the Age Discrimination in Employment Act, and the reference to the burden of persuasion

in that case was clearly dictum since that decision was limited to the appropriate relief to be awarded, because the defendant had not appealed the finding of liability. The more recent opinions of this court have scrupulously followed the language used in the recent Supreme Court opinions and have explicitly distinguished between the burden of articulation which shifts to the defendant and the burden of persuasion which resides always with the plaintiff. *See, e. g., Scott v. University of Delaware*, 601 F.2d 76, 80 (3d Cir.), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); *Whack v. Peabody & Wind Engineering Co.*, 595 F.2d 190, 193 (3d Cir. 1979).

**4.** Justice Stevens, dissenting in *Sweeney* on behalf of four Justices, stated that the words "prove" and "articulate" had been, and could continue to be, used interchangeably. 439 U.S. at 28, 99 S.Ct. at 297. Appellee claims that the

court, after reviewing the articulated reason advanced by Muhlenberg for its employment decision, i. e. Kunda's lack of a master's degree, found that the College had satisfied its burden because "the terminal degree, taken by itself, constitutes a legitimate, nondiscriminatory requirement for tenure and promotion which is justified by the need of an academic institution." It then shifted to an analysis of whether plaintiff had demonstrated the articulated reason was pretextual. Thus the College has no basis for complaint on this issue, because the court, in imposing whatever burden it did on Muhlenberg, found that burden had been satisfied.

### VIII.

■ Appellant's quarrel with the trial court's conclusion that Kunda was the victim of purposeful discrimination in Muhlenberg's failure to promote her is factual in nature, and is primarily directed to the court's finding that Kunda was qualified, one of the *McDonnell Douglas* prerequisites for finding that a prima facie case has been established. Appellant concedes that the standard which governs appellate review of such factual findings is the "clearly erroneous" standard. See Fed.R.Civ.P. 52(a); *Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 109 n.2 (1st Cir. 1979); *Scott v. University of Delaware*, 601 F.2d 76, 81 (3d Cir.), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979). As this court has stated, we "must accept the ultimate fact findings of the trial court unless its determination '(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of

these factors, it may not alter the facts found by the trial court.' *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972)." *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 887 (3d Cir. 1975).

■ On review of the record we cannot say that the trial court's finding that plaintiff was qualified for promotion to Assistant Professor was clearly erroneous. In its Findings of Fact the court referred to the detailed exposition by the FPPC of Kunda's qualifications. That committee, vested with the responsibility of reviewing qualifications of other faculty members, found that Kunda was regarded by her colleagues as an excellent teacher of physical education; developed and introduced new course offerings in the area of her specialty, dance, and in physical fitness; had excellent rapport with students; participated in many and varied professional organizations both on and off campus and at local and state levels; had publications about dance in various professional journals on Physical Education; was active in local women's groups and professional organizations; and presented a series on physical education on local TV. The court also relied on the memorandum of Kunda's department chairman and the testimony of senior members of her department and the faculty of the college that Kunda satisfied all of the requirements for promotion and tenure as set forth in the Faculty Handbook.

■ The College's contention that Kunda was not qualified is limited to her failure to obtain the master's degree. Although there is evidence from which one might question whether the College's published policies permitted the inference that a terminal degree was required for promotion to Assistant Professor[5], the trial court found the Col-

*Sweeney* decision can be construed as limited to the holding that defendant cannot be required to meet a negatively phrased burden such as the absence of discriminatory motive, and that it would not have been inconsistent with *Sweeney* for the trial court to have placed on defendant the burden of persuasion as to the existence of a legitimate nondiscriminatory reason for its action. In view of our decision that

the trial court did not do so, it is not necessary for us to meet appellee's contention.

5. Throughout this appeal, appellant has attempted to avoid the fact that the Faculty Handbook lists three independent bases for the award of promotion, and that a terminal degree is only one of the three. As noted in the text, *infra*, Muhlenberg's President testified that the qualifications for tenure were similar to those

lege met its burden in articulating a legitimate reason for its failure to promote by presenting testimony of the importance of a terminal degree within the college community. Following the program devised by the Supreme Court, the trial court next considered plaintiff's claim that the reason articulated was pretextual, and here found in plaintiff's favor on the issue, referring to the Finding of Fact that three male members of the department who did not have master's degrees were promoted. Muhlenberg's attempt to explain and distinguish each of the three situations raised a factual issue which the trier of fact decided against it. We cannot say that the record is barren of any evidence to support the trial court's findings, and therefore will affirm its ultimate conclusion that plaintiff was discriminated against on the basis of sex in the denial of a promotion.

With respect to tenure, the district court followed a somewhat different pattern, imposing on plaintiff the burden to show an "additional element" in establishing a prima facie case because of the "unusual nature of the tenure decision." We see nothing in the Supreme Court decisions which permits the trial courts to require any additional proof by Title VII plaintiffs because the relevant employment decision

has been made within the confines of an academic institution. We do not understand that when the Court indicated the requirements for establishing a prima facie case may vary in different factual situations, *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13, it intended to impose a higher burden on those seeking permanent employment in an academic institution. As will be discussed at more length in the next section on remedy, academic institutions and decisions are not ipso facto entitled to special treatment under federal laws prohibiting discrimination.

We do not suggest that either of the factors referred to by the trial court as sufficient to show the additional "element" is irrelevant in this case. On the contrary, the trial court recognized that the procedural irregularities could be considered in connection with its finding that the discrimination was intentional. The other proof referred to by the court which could show the additional "element" needed for a prima facie case, that comparable males were granted tenure, is already part of the required Title VII case, since it fits within the fourth *McDonnell Douglas,* factor paraphrased for this situation to require a showing that there were tenure positions open

---

published for promotion. Appellant skirts the two bases for qualification other than the terminal degree by arguing that "nobody has ever within the living memory of any witness been either promoted or granted tenure on the basis of his possession of some scholarly equivalent to a terminal degree or recognized achievement in the field." (tape of argument, October 16, 1979). The suggestion that an academic institution may deviate from its published qualifications contained in a Faculty Handbook causes us some concern. The 1940 *Statement of Principles on Academic Freedom and Tenure,* formulated by the AAUP and the Association of American Colleges, prescribes that "the precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated." The AAUP's 1971 *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments* further recommended:

The faculty member should be advised, early in his appointment, of the substantive and procedural standards generally employed in

decisions affecting renewal and tenure. Any special standards adopted by his department or school should also be brought to his attention.

*AAUP Policy Documents and Reports* 8, 9 (1977). We need not decide whether this imposes a legal obligation on the College were it to have some relationship with the AAUP, a fact not before us, but it would certainly be relevant to a determination whether the candidate has been treated fairly if the institution, without explicit notice to the candidate, failed to adhere to its published policy and failed to amend or withdraw it. It might also be used to discredit the legitimacy of the articulated reason for both the denial of tenure and failure to promote in this case. In light of the ultimate disposition we make of this appeal, we need not decide the extent to which the stated "legitimate reason" for the employment decision must be credible in order to satisfy the burden of articulation which the employer bears, or whether lack of credibility goes only to the pretextual nature of the articulated reason.

and the employer continued to grant tenure to comparable male members.

■ Since the court found that plaintiff had established a prima facie case on the denial of tenure but that the college's articulated reason for its denial, lack of a master's degree, was not pretextual, the only issue before us on tenure is the court's conclusion that Kunda was the subject of disparate treatment because males were counseled as to the need to obtain a master's degree in order to be granted tenure and Kunda was not so counseled. Here again, Muhlenberg's objection is that the finding was "clearly erroneous", and once again, our review of the record discloses it contains the sufficient quantum of evidentiary support for that finding.[6]

The trial court found that "[d]efendants have given no convincing reason for their failure to inform Mrs. Kunda of the necessity of obtaining a masters degree," nor has appellant done so in this court. Thus, there was a failure on the part of Muhlenberg to articulate a legitimate basis for its failure to counsel Kunda comparably to males regarding the need for a master's degree. In view of the importance which the College itself placed on the possession of such a degree, notwithstanding the published standards referring to other criteria, the disparate treatment could reasonably have been considered substantial by the trial court.

The final issue on liability is whether the requisite intentional discrimination needed in a disparate treatment case has been shown. It is, of course, established that

Intentional unfair employment practices are those engaged in deliberately and not accidentally. No wilfullness on the part of the employer need be shown to establish a violation of section 706(g).

_Kober v. Westinghouse Electric Corp.,_ 480 F.2d 240, 246 (3d Cir. 1973); _International Brotherhood of Teamsters v. United States,_ 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854–1855 n.15, 52 L.Ed.2d 396 (1977). The requisite motive can be inferred "from the mere fact of differences in treatment." _Id._

The trial court recognized the need to make findings on this issue, and determined that the disparate treatment with respect to counseling was not the result of mere inadvertence, but instead constituted purposeful discrimination on the basis of sex. Among the factors on which the trial court relied for this finding were the failure of Dean Secor and President Morey to tell Kunda that her failure to obtain a master's degree would be a barrier to her advancement, although she had sought them out concerning her future at Muhlenberg, that Dean Secor at least was particularly alert to the need to counsel in this area since his own memorandum of his conversation with Lauchnor indicates that he cautioned Lauchnor that he could not rely on the prior actions as to Whispell and Flamish, and that statistical evidence,[7] credited by the court, suggested that Secor's tenure recommendations were related to a candidate's sex. In an earlier paragraph, the trial court had referred to the relevance of the procedural irregularities by Dean Secor to the issue of intent. While appellant again attempted to explain each of these factors, we cannot say that the district court could not reasonably determine that, in totality, they showed the requisite intent.

### IX.

The most provocative issue raised on appeal concerns the remedy fashioned by the district court. Those aspects of the remedy which award reinstatement and back pay

---

**6.** For example, Beidleman testified that Dean Secor "proceeded to explain to me that he considered the master's degree to be the terminal degree in the area of physical education and told me in effect and in no uncertain terms with the words that it was my union card and encouraged me to continue to endeavor to achieve that master's degree." 329a.

**7.** For the relevance of statistical evidence on the issue of intentional discrimination, see _Dothard v. Rawlinson,_ 433 U.S. 321, 328–31, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977); _International Brotherhood of Teamsters v. United States,_ 431 U.S. 324, 339 n.20, 97 S.Ct. 1843, 1856 n.20, 52 L.Ed.2d 1843 (1977); _Village of Arlington Heights v. Metropolitan Housing Corp.,_ 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

fit within the traditional Title VII remedies. See *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415–16 & n.9, 95 S.Ct. 2362, 2370–71 & n.9, 45 L.Ed.2d 280 (1975); *Jurinko v. Edwin L. Wiegand Co.*, 477 F.2d 1038, 1046 (3d Cir.), *vacated on other grounds*, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973); cf. *Rosen v. Public Service Electric and Gas Co.*, 477 F.2d 90, 96 (3d Cir. 1973).

Appellant and one group of amici argue however that the portion of the court's order dealing with tenure is unique, and that this will be the first case in which a judicial award of tenure for a Title VII violation has been sustained. This, they claim, represents an unwarranted intrusion by the judiciary into the academic mission of an educational institution which they apparently conclude threatens academic freedom itself. The contention warrants careful analysis because appellant's claim misconceives both the nature of academic freedom and the nature of the relief awarded by the court.

The essence of academic freedom is the protection for both faculty and students "to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). It is the lifeblood of any educational institution because it provides "that atmosphere which is most conducive to speculation, experiment and creation." *Id.* at 263, 77 S.Ct. at 1218 (Frankfurter, J., concurring). Only when students and faculty are free to examine all options, no matter how unpopular or unorthodox, without concern that their careers will be indelibly marred by daring to think along nonconformist pathways, can we hope to insure an atmosphere in which intellectu-

al pioneers will develop. Academic freedom prevents "a pall of orthodoxy over the classroom"; it fosters "that robust exchange of ideas which discovers truth." *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). Our future, not only as a nation but as a civilization, is dependent for survival on our scholars and researchers, and the validity of their product will be directly proportionate to the stimulation provided by an unfettered thought process.[8] From unconventional contemplation we have derived, among others, current theories of the solar system, gravitational force, relativity, and the origin of the species. Therefore, academic freedom, the wellspring of education, is entitled to maximum protection.

■ It does not follow that because academic freedom is inextricably related to the educational process it is implicated in every employment decision of an educational institution. Colleges may fail to promote or to grant tenure for a variety of reasons, such as anticipated decline in enrollment, retrenchment for budgetary reasons, termination of some departments, or determination that there are higher priorities elsewhere. These are decisions which may affect the quality of education but do not necessarily intrude upon the nature of the educational process itself.

■ On the other hand, it is beyond cavil that generally faculty employment decisions comprehend discretionary academic determinations which do entail review of the intellectual work product of the candidate. That decision is most effectively made within the university and although there may be tension between the faculty and the administration on their relative

---

**8.** It is the function of the scholar to evoke into life wisdom and beauty which, apart from his magic, would remain lost in the past. A progressive society depends upon its inclusion of three groups—scholars, discoverers, inventors . . . I am here using the term "discovery" to mean the progress of knowledge in respect to truths of some high generality, and the term "invention" to mean the progress of knowledge in respect to the application of general truths in particular ways subservient to present needs . . . What is important for a nation is that there shall be a very close relation between all types of its progressive elements, so that the study may influence the market place, and the market place the study. Universities are the chief agencies for this fusion of progressive activities into an effective instrument of progress. Of course they are not the only agencies, but it is a fact that to-day the progressive nations are those in which universities flourish. A. N. Whitehead, The Aims of Education 102–03 (Mentor paperback ed. 1955).

548

roles and responsibilities, it is generally acknowledged that the faculty has at least the initial, if not the primary, responsibility for judging candidates. "[T]he peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1346 (W.D.Pa. 1977).

 Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges. In the cases cited by appellant in support of the independence of the institution, an adverse judgment about the qualifications of the individual involved for the position in question had been made by the professionals, faculty, administration or both. It was those adverse judgments that the courts refused to re-examine. *See, e. g., Johnson v. University of Pittsburgh, supra; Huang v. College of the Holy Cross*, 436 F.Supp. 639 (D.Mass.1977); *EEOC v. Tufts Institu-*

tion of Learning*, 421 F.Supp. 152 (D.Mass. 1975).⁹ *But see Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106 (1st Cir. 1979). [on remand from 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)].

The distinguishing feature in this case is that Kunda's achievements, qualifications, and prospects were not in dispute. She was considered qualified by the unanimous vote of both faculty committees which evaluated her teaching, research and creative work, and college and public service. Her department chairman consistently evaluated her as qualified. Even Dean Secor, who did not affirmatively recommend Kunda, commented favorably on her performance, which he rated as "justify[ing] a permanent appointment."

The College has not suggested that financial considerations played a role in denial of Kunda's tenure. Therefore, the reason for the reference to such considerations in the dissent is puzzling. Despite the concern expressed by Dean Secor on the future of the Physical Education Department when Kunda was being reconsidered at the 1972 FPPC meeting and in his negative recommendation letter to President Morey of November 30, 1973, at his deposition (introduced at trial) Dean Secor "absolutely" and "most emphatically" denied that such concerns were used at any stage of Kunda's review. Dean Secor's testimony is explicit that financial considerations *were not* a factor in his consideration.¹⁰

**9.** In *Faro v. New York University*, 502 F.2d 1229 (2d Cir. 1974), the employment decision was found to have been the result of financial strain at the University's Medical School.

**10.** Dean Secor testified:
Q: Did these fiscal concerns which you have just been describing and their possible impact sometime in the future on the college as a whole and the Phys Ed Department in particular, or other performing art departments, ever have an effect on any promotion or tenure recommendation that you made as to individual faculty members?
A: I have reviewed within the last few days some of the documents, and so my memory is refreshed on that point.

I did, in fact, and I don't recall any other time, mention that factor in my recommendation concerning Mrs. Kunda. I don't recall any other time when I did.
Q: That was with regard to Mrs. Kunda's tenure consideration?
A: Correct.
Q: Is that correct?
A: Correct.
Q: Do you recall that fiscal consideration or concern about the future of the department ever becoming a factor?
A: Oh, *it clearly did not*, because Dr. Morey was very clear about that, that there would be no intrusion of any of those considerations for the cases which were currently pending. (emphasis added).
557a–558a.

The district court made a specific finding of fact (No. 30) that President Morey did not recommend tenure for Kunda "because of her lack of an advanced degree". The record is manifest that if President Morey had recommended Kunda for tenure, the Board of Trustees would have ratified that decision. The College had ample opportunity during the trial to present testimony as to any other factor on which the decision to deny tenure was based and failed to do so. Thus, the trial judge's finding that plaintiff "had satisfied both alternatives to the terminal degree requirement for promotion and tenure" was based not on his independent judgment, but on the judgment of the university community itself. In the line of cases challenging university decisions not to promote or grant tenure, this case may therefore be sui generis, or at least, substantially distinguishable.

Nor can the court's order be construed as appellant does—as a judicial grant of tenure. Underlying the court's order was its finding of fact that "[h]ad Mrs. Kunda been counselled in the same manner as male members of the Physical Education Department, we find that she would have done everything possible to obtain a masters degree in order to further enhance her chances of obtaining tenure." The court did not *award* Kunda tenure. The court instead attempted to place plaintiff in the position she should have been "but for" the unlawful discrimination. Having found she was denied tenure because she did not have a terminal degree, the court gave her the opportunity to secure one within two full school years, the period between the time she should have been counseled in 1972 and the tenure decision in 1974. The direction by the court to the college to grant her tenure after she secured the one missing link upon which her rejection by the college had been based is consistent with the line of Title VII cases awarding seniority and other employment perquisites to those found to have been victims of discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 1843 (1977); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The court could have reasonably decided that there would be no purpose to be served to require that the Board of Trustees reconsider plaintiff's tenure after she achieved a master's degree because of the impossibility of asking the Board to ignore changes such as the financial situation, student enrollment, and faculty hiring which may have occurred in the intervening five year period,[11] as well as the intangible effect upon that decision because the candidate being considered was the successful party to a Title VII suit.

The touchstone of Title VII remedies is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). In directing the award of competitive-type seniority, the Court noted the broad scope of the courts' equitable discretion in Title VII cases:

> To effectuate this "make-whole" objective, Congress in § 706(g) vested broad equitable discretion in the federal courts to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . ., or any other equitable relief as the court deems appropriate." The legislative history supporting the 1972 amendments of § 706(g) of Title VII affirms the breadth of this discretion. "The provisions of [§ 706(g)] are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible . . . . . [T]he Act is intended to make the victims of unlawful employment discrimination whole, and . . . the attainment of this objective . . . requires that persons aggrieved by the consequences

11. New tenure guidelines which became effective in the 1974–75 academic year and which restricted the grant of tenure were not to be applied to persons, such as Kunda, hired before that time.

and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." . . . This is emphatic confirmation that federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible the victims of racial discrimination in hiring.

*Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976) (citations omitted).

■ The fact that the discrimination in this case took place in an academic rather than commercial setting does not permit the court to abdicate its responsibility to insure the award of a meaningful remedy. Congress did not intend that those institutions which employ persons who work primarily with their mental faculties should enjoy a different status under Title VII than those which employ persons who work primarily with their hands.

■ The legislative history of Title VII is unmistakable as to the legislative intent to subject academic institutions to its requirements. When originally enacted, Title VII exempted from the equal employment requirements educational institution employees connected with educational activities. This exemption was removed in 1972. The need for coverage is amply set forth in the Report of the House Committee on Education and Labor.

There is nothing in the legislative background of Title VII, nor does any national policy suggest itself to support the exemption of the educational institution employees—primarily teachers—from Title VII coverage. Discrimination against minorities and women in the field of education is as pervasive as discrimination in any other area of employment. In the field of higher education, the fact that black scholars have been generally relegated to all-black institutions, or have been restricted to lesser academic positions when they have been permitted entry into white institutions is common

knowledge. Similarly, in the area of sex discrimination, women have long been invited to participate as students in the academic process, but without the prospect of gaining employment as serious scholars.

When they have been hired into educational institutions, particularly in institutions of higher education, women have been relegated to positions of lesser standing than their male counterparts. In a study conducted by Theodore Kaplow and Reece J. McGree, it was found that the primary factors determining the hiring of male faculty members were prestige and compatibility, but that women were generally considered to be outside of the prestige system altogether.

The committee feels that discrimination in educational institutions is especially critical. The committee can not imagine a more sensitive area than educational institutions where the Nation's youth are exposed to a multitude of ideas that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote misconceptions leading to future patterns of discrimination. Accordingly, the committee feels that educational institutions, like other employers in the Nation, should report their activities to the Commission and should be subject to the provisions of the Act.

Equal Employment Opportunity Act of 1972, H.Rep. No. 92–238, 92nd Cong., 2d Sess. (1972) *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2137, 2155.

The status of women in academia has been a subject of concern to scholars and others.

Perhaps surprising, but by now well documented, the relative representation and status of women as faculty members at universities and colleges [42] deteriorated from the 1930s to 1970. The proportion of women serving in academic positions declined.[43] Salary differentials associated with sex were marked and prevailed for every race.[44] Legislation in the 1960s prohibiting sex discrimination in employ-

ment left academic employment untouched. The Equal Pay Act did not apply to academic and professional employees until amended in July 1972. Title VII excluded academic employment until its scope was enlarged by the Equal Employment Opportunity Act of 1972. State fair employment practice laws, even when they covered campus hiring and promotions, remained untried in this area.' K. Davidson, R. Ginsburg, H. Kay, Sex-Based Discrimination 870 (1974).[12] The lack of success of women and minorities in Title VII suits alleging discrimination against academic institutions can, in large part, be attributed to the subjective factors upon which employment decisions are made, previously discussed. The danger that judicial abnegation may nullify the congressional policy to rectify employment bias in an academic setting has been noted:

> This anti-interventionist policy has rendered colleges and universities virtually immune to charges of employment bias, at least when that bias is not expressed overtly. We fear, however, that the common-sense position we took in [*Faro v. New York University*, 502 F.2d 1229 (2d Cir. 1974)], namely that courts must be ever-mindful of relative institutional competences, has been pressed beyond all reasonable limits, and may be employed to undercut the explicit legislative intent of the Civil Rights Act of 1964.

*Powell v. Syracuse University*, 580 F.2d 1150, 1153 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). When a case is presented such as this, in which the discrimination has been proven and the required remedy is clear, we cannot shirk the responsibility placed on us by Congress.

## X.

In summary, appellant's arguments are directed to the factual findings and the inferences to be drawn from them. We have reviewed the evidence in what may be excessive detail because of the vehemence of Muhlenberg's claim that the findings cannot be supported. While there may have been room for differing interpretations of the facts, Judge Huyett had the opportunity to observe the principal witnesses, Kunda, Lauchnor, Whispell, Beidleman, President Morey and others. His findings are unequivocal and reasonable in light of the record. Appellant cannot retry the case in this court because it would prefer that contrary inferences had been made.

For all of the foregoing reasons, we will affirm the order of the trial court in its entirety.

GARTH, Circuit Judge, concurring and dissenting in part:

I agree with the majority that we should affirm the district court's finding that the College had discriminated against Kunda. I also agree that it is appropriate to affirm the remedy of reinstatement with promotion and back pay. Thus, I join parts I through VII of the majority opinion.

I part company, however, with the majority when, in the absence of an essential finding of fact, and, of more importance, in the absence of record evidence supporting

---

12. The following footnotes accompany the text cited above:

[42.] See Carnegie Commission Study at 1 (estimating that on the average women receive within the range of about $1500 to $2000 less per year per faculty member than do men in comparable situations, which adds up to about $150 to $200 million per year across the nation). Federal statistics compiled by the National Center for Educational Statistics, based on reports from 2,480 institutions of higher education across the country, indicate that in the 1972–73 academic year, colleges and universities paid women faculty members an average of about 17 percent less than they paid men faculty members. The same report also shows the proportion of women in various ranks at all institutions surveyed as: professor, 9.8%; associate professor, 16.3%; assistant professor, 23.8%; instructor, 39.9%. Differences based on type of institution were marked. For example, women constituted 31.5% of full professors at private two-year colleges, but only 5.4% at private universities.

[43.] Carnegie Commission Study at 110.

[44.] Id. at 209 (noting that, in contrast, the apparent discrimination in faculty salaries associated with race was small and not statistically significant).

such a finding, it unconditionally directs that Kunda be granted tenure if she obtains her master's degree within two years.[1] This remedy, in my view, is not called for on this record and constitutes a serious judicial intrusion upon the obligations and responsibilities of Muhlenberg's Board of Trustees.

The majority properly concedes that tenure is "the most provocative issue raised on [this] appeal" (At 546); that tenure determinations include, among other considerations, judgments of future enrollment, budgetary factors, determinations of different and higher priorities, and the like; and that tenure decisions comprehend "discretionary academic determinations" (At 547) entailing review of the candidate's work product. These decisions, the majority admits, are most effectively made within the university. The majority also properly acknowledges that the responsibility for tenure is that of the particular institution and that "courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college." (At 548). Moreover, the majority acknowledges that the evaluation of tenure should be made by professionals "since they [the evaluations] often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." (At 548). The majority also recites, without dispute, the appellants' argument that the district court's order dealing with tenure is unique and that this is the first case in which judicial award of tenure is sustained.

Having recognized these concepts, however, the majority then ignores them and grants Kunda tenure. Perhaps I could agree with the majority if there indeed was an unequivocal finding of fact which was based on sufficient evidence: that *all* levels of tenure review had considered *all* aspects of Kunda's qualifications, as well as *all* elements involved in the granting of tenure, and had then determined that the only

missing ingredient was Kunda's graduate degree. But this is not that case. As I demonstrate in the remainder of this dissent, the record does not reveal the requisite finding, the requisite evidence or such circumstances as would mandate that we, as judges, should "substitute [our] judgment for that of the college with respect to the qualifications of faculty members for . . . tenure." (At 548).

I would therefore reverse so much of the district court order as directs that tenure be granted to Kunda when she obtains her master's degree, and I would leave the decision of whether tenure should be granted, to the Board of Trustees, on whom that obligation rests. This, in my view, would restore Kunda to the position in which she would have been had there been no discrimination. Title VII requires no less and we can do no more.

I.

As the majority recognizes, the goal of the relief granted under Title VII to a successful plaintiff is to place her in the position she would have been but for the defendants' unlawful discrimination. Thus, the district court's conditional grant of tenure in this case depends wholly upon a finding of fact that Kunda would have been granted tenure if she had her master's degree. On my reading of the district court's opinion, I cannot discern such a finding. And in any case, based upon my review of the record, I am convinced that such a finding, if made, would be clearly erroneous.

In the portion of its opinion labelled "Findings of Fact," the district court finds that Kunda did not receive the same counselling given to men about the need for an advanced degree, 463 F.Supp. at 305; that this disparate treatment was discriminatorily motivated, *id.*; and that, if properly counselled, Kunda would have made every

---

1. The majority repeatedly emphasizes that the district "court did not *award* Kunda tenure." (At 549; emphasis in original). While it is true that Kunda must first obtain her master's degree, nevertheless, once having done so, ten-ure automatically attaches under the district court's order as affirmed by the majority. Thus, it is the *court* that is granting tenure, not the College.

effort to obtain the requisite degree, *id.* Significantly, the court does not proceed to the essential additional finding that, *if Kunda had obtained her degree, she would have been granted tenure.*

In the portion of the district court's opinion labelled "Discussion," under the subheading "III. Relief," the court repeats its findings of disparate counselling, discriminatory motive, and Kunda's likely effort to obtain her degree, *id.* at 313. The court then concludes that "Therefore, in order to make the plaintiff whole for the discrimination she suffered, we must somehow restore to her this 'lost opportunity' to obtain the masters [sic] degree prior to being considered for tenure," *id.* Shortly thereafter the critical "finding" appears: "If plaintiff is able to complete the requirements for her masters [sic] degree within this time period, then plaintiff should be granted tenure retroactive to September, 1975. This is the date that tenure would have been granted to plaintiff if she had not been subjected to unlawful sex discrimination" *id.* In the next paragraph, after it has awarded Kunda reinstatement with back pay, the district court states: "The award of these remedies is premised upon the *assumption* that plaintiff would have been granted tenure but for defendant's discriminatory acts" *id.* at 313–14 (emphasis added).

I have grave reservations as to (1) whether the court's statement that "[September, 1975] is the date that tenure would have been granted to plaintiff if she had not been subjected to unlawful sex discrimination," was intended, or should be construed, as a "finding" of fact by the district court; and (2) whether that "finding" is supported by evidence. The court clearly divided its opinion into three parts, labelled "Findings of Fact," "Discussion," and "Conclusions of Law." In the section labelled "Findings of Fact," the district court marshalled record support for its determinations after each material finding. While all other factual premises relied upon in the court's discussion of the appropriate relief are, as noted, expressly set forth in the "Findings of Fact" portion of the opinion, the statement that Kunda would have been granted ten-

ure but for the discrimination, is *not.* It appears from the opinion that this statement is *not* offered as a finding of fact, but rather as an assumption employed for the purpose of fashioning appropriate relief. Indeed, the district court itself expressly refers to its statement that Kunda would have been granted tenure, as an "assumption" upon which "[t]he award of these remedies is premised," *see id.* at 313–14. Thus, I hesitate to accord the district court's "assumption" the dignity of an express finding of fact, particularly since it leads to a remedy which, even the majority must concede, is unique.

## II.

Assuming, however, that an "assumption" made by the district court should be read as a finding of fact, it is a "finding" that has no evidentiary support in the record. Indeed, what evidence there is suggests a contrary conclusion. Thus I must conclude that this "finding," if such it be, is clearly erroneous, and cannot support the relief granted by the district court. My review of the record reveals the following:

(1) In his letter of November 30, 1973 to President Morey recommending that Kunda be denied tenure, Dean Secor wrote that he made his negative recommendation "with an eye primarily on the present and future financial condition of the College." He elaborated as follows:

I wish I could recommend her for tenure, for I think that her performance justifies a permanent appointment. I must take into account the fact that she is one of only three members of a very large department who is currently untenured. Furthermore, from an administrative point of view I find it important to make some assessment of the likelihood over the long run of maintaining a Physical Education Dept. of the size which we presently have. Certainly I hope that this will be possible. However, I must be realistic to perceive that if the financial pinch becomes very severe in the years immediately ahead, we may need to elim-

inate certain departments or drastically to curtail them. Long before I would recommend the curtailment or elimination of most other academic departments I would have to recommend the serious curtailment of the Physical Education Department. This means that it does become important to keep one's options as open as possible in this particular area.

Dean Secor also wrote that he felt possession of a master's degree should not weigh against a grant of tenure: "Such considerations, however, as the relevance of advanced degrees and of scholarly publications are very questionable when it comes to many people in Physical Education."

(2) The minutes of the meeting of the Faculty Board of Appeals on January 16, 1975 indicate that the FBA committee had spoken to Dean Secor and President Morey about the reasons for denying Kunda tenure. Dean Secor stated at this time that financial considerations *did not* play a role in the decision. President Morey stated that he recommended a denial of tenure because Kunda had twice been denied promotion and did not possess the requisite master's degree.

(3) The FBA memorandum to President Morey dated January 20, 1975 reports that the FBA "has no evidence which would indicate that in this particular case there were significant fiscal considerations that mandated the ultimate decision."

(4) President Morey, in his memorandum of February 24, 1975 to the Trustees Committee considering Kunda's appeal, stated:

In all of this my position has been that an exception had been made in 1966 when Mrs. Kunda was hired without the M.A., and that I could not recommend that additional exceptions be made for promotion or for tenure. While it is true that there are male members of the Physical Education Department who have been tenured, holding only the bachelor's degree, those decisions were made prior to my assuming office in 1969. It has been my policy to recommend persons for tenure only if they are fully qualified academically.

There is only one interpretation that can be given to these evidentiary materials: Dean Secor made an original recommendation to President Morey that Kunda be denied tenure for financial considerations, but President Morey based *his* negative recommendation on Kunda's lack of a master's degree. This simply cannot support a finding that Kunda *would have been granted tenure if she had the degree.* A decision to deny tenure predicated on the absence of a degree is a far cry from a decision that tenure *would* be granted if the candidate had the degree. As the majority opinion admits, tenure decisions are based on a variety of considerations, including teaching ability, scholarship, possession of academic credentials, percentage of tenured faculty in the department, financial considerations of the department, and financial considerations of the college and university as a whole, to name only the most obvious factors. The decision of an official to deny tenure based on *one* of these considerations, as President Morey did here with respect to the lack of a master's degree, simply cannot be read as a decision that all other factors *support* an award of tenure and that, but for the single consideration cited, tenure would have been granted. Additional evidence is required to support such a conclusion. Yet no such additional evidence is cited by the district court, the parties or the majority. Thus, I conclude that the district court's "finding" (if such a "finding" indeed was made), that Kunda would have been granted tenure if she possessed her master's degree, is without evidentiary support and, therefore, must be deemed clearly erroneous.

### III.

In light of the absence of a defensible finding that Kunda would have been granted tenure if she had her degree, I do not understand how it can be maintained that the conditional tenure awarded by the district court places Kunda in the position she would have been, but for the defendants' unlawful discrimination. In this posture, I believe the only appropriate course is to

give Kunda time to obtain her degree, and then permit Muhlenberg to make its decision on tenure. In making this decision, the College would be prohibited from denying tenure on the basis of any factors not present at the time of the original tenure decision. If Kunda were again denied tenure, I would require the College to bear the burden of proving that its decision was not based on sexual animus, was not based on factors not present at the time of the original tenure decision, and was not in retaliation for Kunda's successful suit against the College. Requiring the College to carry this burden amply protects Kunda's interests and meets the concerns alluded to in the majority opinion.[2]

Such an approach was adopted recently by this court in *Richerson v. Jones*, 551 F.2d 918 (3d Cir. 1977). In *Richerson*, the district court awarded retroactive promotion to a naval engineer determined to be the victim of racial discrimination. The Court of Appeals vacated this relief and remanded to give the defendant United States an opportunity to prove that Richerson would not have been promoted even without the unlawful discrimination. The United States was required to bear the burden of persuasion on this issue. The court held:

> [Title VII] authorizes courts to order "such affirmative action as may be necessary" to remedy unlawful employment practices. However, that provision also states:
>
> > No order of the court shall require . . . promotion of an individual as an employee . . . if such individual . . . was refused . . . advancement . . . *for any reason other than discrimination* on account of

race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title. (Emphasis added.)

Consequently, the district court in this case could order retroactive promotion of Richerson to GS–12 only if it found that Richerson would have attained that position but for the defendant's unlawful employment practices.

\*　　\*　　\*　　\*　　\*　　\*

In sum, since we are unable to determine the basis upon which the district court awarded Richerson retroactive promotion to GS–12, that portion of the district court's order must be reversed and the case must be remanded so that the district court may make specific findings of fact (on this record or as it may require supplementation) with respect to the classification which Richerson would have achieved but for the defendant's discriminatory acts. On remand, the government will bear the burden of proving by a preponderance of the evidence that even absent discrimination Richerson's qualifications were such that he would not have been selected for the GS–12 position.

551 F.2d at 923–25 (footnotes and citations omitted).

In Kunda's case, where the defendants have been found to have discriminated *not in denying tenure*, but merely in *not adequately counselling her on the need for a master's degree*, an analogous approach is clearly indicated. Thus, I believe that the most we as a court can and should do, is to restore to Kunda her lost opportunity, *i. e.*, to be considered for tenure after she has had time to obtain her advanced degree. The make-whole relief required by Title VII mandates no more.

---

**2.** The majority is evidently concerned that, if we required the Board to make the tenure determination after allowing Kunda time to obtain her degree, the Board may find it impossible to ignore "changes such as the financial situation, student enrollment, and faculty hiring which may have occurred in the intervening five year period." (At 549; footnote omitted). The majority also apparently fears "the intangible effect upon [the Board's] decision because the candidate being considered was the successful party to a Title VII suit." (*id.*).

These concerns apparently have led the majority to its conclusion that the court should grant Kunda tenure outright, subject only to her completion of her master's degree. I, on the other hand, feel that such fears are unfounded and unsupported in the record. Thus, they do not provide any principled basis requiring us to deviate from the precepts of appropriate relief under Title VII and from the dictates of judicial deference.

I must, therefore, respectfully dissent from so much of the majority opinion approving court awarded tenure.