Ashfaq KURESHY, Plaintiff,

v.

CITY UNIVERSITY OF NEW YORK; College of Staten Island; Edmund Volpe, President of the College of Staten Island, individually and in his official capacity; and Reuben Benumof, former Chairman of the Department of Physics, Geology and Astronomy at the College of Staten Island, individually, Defendants.

No. 80 CV 0637 (ERN).

United States District Court, E.D. New York.

April 14, 1983.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C. by Ellen J. Winner, Victor Rabinowitz, New York City, for plaintiff.

Frederick A.O. Schwarz, Jr., Corp. Counsel for the City of New York by Susan R. Rosenberg, Caryn M. Hirshleifer, New York City, for defendants.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Plaintiff, Ashfaq Kureshy, Ph.D., a dark-skinned Muslim from India, alleges in this action that defendants discriminated against him in their employment practices based upon his race, color, national origin, and religion, in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. §§ 1981 & 1983.[1] Plaintiff had been employed as an Associate Professor of Geology at Staten Island Community College ("SICC") from September 1972 until August 1977. He complains, however, that several of defendants' decisions and actions affecting his employment resulted from impermissible discrimination.

He alleges, first, that SICC should have hired him for any of three positions that were available prior to the vacancy he filled and, second, that when he was hired he should have been compensated at a salary above the entry level rate. Next, he contests SICC's repeated rejections of his applications for promotion to full professor, and its denial of his application for early tenure. Further, he claims that he should have been financially reimbursed for the semester that he taught an increased course load. Finally, he challenges the denial of his application for statutory tenure and the resultant termination of his employment.

## Findings of Fact
### Hiring and Salary

Dr. Kureshy's relationship with SICC commenced with an advertisement placed by the College in the February 1971 issue of GeoTimes (a professional journal) seeking a geology professor for the fall semester. Dr. Kureshy, then residing in Calgary, Canada, inquired about this position in a letter dated April 8, 1971. On March 25, however, Dr. Reuben Benumof, then Chairman of the SICC Department of Physics, Geology, and Astronomy ("Geology Department") and now a defendant, had already offered an appointment as an associate professor of Geology to Ernest Kaarsberg, Ph.D., who accepted the position before the end of the month.

SICC was a unit of the City University of New York ("CUNY"), which is governed by the New York City Board of Higher Education ("BHE"). Funds had been made available to CUNY for a limited period of time to enable CUNY to recruit attractive professorial candidates to fill what were called "Bowker-line" appointments. It was one of these positions that was offered to Dr. Kaarsberg and which he accepted at a starting salary of $18,760 to commence in September 1971, with an increase to $19,830 on October 1, 1971.

SICC never responded to Dr. Kureshy's initial inquiry, nor did he receive a reply to his subsequent letter from Calgary dated

---

1. After counsel for the parties had submitted post-trial briefs, plaintiff, acting separately from his counsel, filed a supplemental post-trial reply brief and a motion to amend and supplement the complaint. Plaintiff's *pro se* motion sought to add claims based upon defamation, fraud, retaliation for filing this suit, perjury, breach of the collective bargaining agreement, and violation of College by-laws and published policy. These issues were not addressed at trial in any significant manner, and to allow so belated an amendment to include such diverse issues would not only prejudice the defendants, but would burden the Court with the need to decide issues without a sufficient evidentiary record. Similarly, plaintiff's *pro se* brief discusses evidence which was either not submitted or which was specifically excluded at trial. Where plaintiff's *pro se* brief does address matters fairly at issue in this case, it is duplicative of the papers ably prepared by his counsel. For these reasons, plaintiff's *pro se* motion to amend is denied, and his *pro se* brief will not be considered.

May 31, 1971. Dr. Almeleh, who was then handling recruitment for the Geology Department, testified that his records included a handwritten notation that a response had been sent on June 10, 1971.

On July 26, 1971, a second position in the Geology Department unexpectedly became available. Needing a professor who could be ready for fall classes, the College conducted an abbreviated search and hired Anderson Ohan, who had been previously employed as an adjunct assistant professor. The College did not contact the potential candidates whose applications it had on file, and therefore did not consider Dr. Kureshy for this vacancy. Ohan's position was not a "Bowker-line" position, and he entered at the rank of assistant professor and was compensated at the entry level salary for that rank.

In January 1972, another vacancy arose suddenly in the Geology Department, and again the College filled the position without searching its files. G. Gordon Connally, Ph.D., was hired as an assistant professor at entry level salary to commence teaching in February 1972. The College indicated that the position was available for one semester only.

Dr. Kureshy, who had moved to New York City in September 1971, next contacted SICC by letter dated March 6, 1972, mailed from a Manhattan address. By return letter dated March 21, 1972, Dr. Benumof replied that no vacancy existed but that Dr. Kureshy's application would be kept on file.

On August 18, 1972, Dr. Connally resigned. Finding that it still needed an additional Geology professor, SICC contacted the applicants it had on file. In a letter dated August 21, 1972, SICC invited Dr. Kureshy to interview on September 6, 1972, at 4 p.m. Although Dr. Kureshy believes that the relatives with whom he had resided in Manhattan would have forwarded this letter, he testified that it never reached him at his new Bronx address. Instead, Dr. Kureshy responded to an advertisement for the position which appeared in the New York Times. He was given the same inter-

view time, and was ultimately selected for the position over several other qualified candidates. His employment as an associate professor, compensated at the entry level salary of $17,830, was thus effective as of September 1, 1972.

*Failure to Promote*

Dr. Kureshy first applied for promotion to full professor in the spring of 1973. Requests for promotion from associate to full professor at SICC were made initially to a subcommittee of the College Personnel and Budget Committee ("P & B") and then to the full P & B Committee. The chairman of the College's sixteen departments and the Dean of Faculty sat as voting members of this Committee, and the Dean of Students and the College President were nonvoting members. A positive P & B decision would next be reviewed by the President, and ultimately by the BHE.

The standard for promotion from associate to full professor stated:

"[T]he candidate must possess the qualifications for an associate professor, and in addition a record of exceptional intellectual, educational, or artistic achievement. There shall be evidence of his continued growth. Longevity and seniority alone shall not be sufficient for promotion." Exhibit D–27.

During Dr. Kureshy's period of employment, ten associate professors were promoted to full professor. All ten were white, all had been hired prior to Dr. Kureshy, and all were tenured as associate professors prior to being promoted.

Dr. Kureshy was not promoted, but he was reappointed for another year as an associate professor, with "reservation as to clarity of speech." He applied again for promotion in the spring semesters of 1974, 1975, and 1976, and although he was reappointed in 1974 and 1975, he was never promoted. Each of Dr. Kureshy's annual promotion applications was denied because it failed to receive a positive recommendation from the P & B subcommittee.

*Denial of Early Tenure*

By statute, a CUNY faculty member became tenured automatically when reappointed for a sixth year. N.Y.Educ.Law § 6206–b. Under § 6.2 of the BHE By-Laws, the College could in its discretion award tenure at an earlier date. That by-law, in effect during Dr. Kureshy's employment, did not specify the criteria upon which an early tenure decision should be made, except to require "not less than one nor more than five years of continuous satisfactory service on an annual salary basis." Dr. Benumof testified, however, that custom and practice at SICC dictated that early tenure be awarded only in exceptional circumstances.

Consideration for early tenure was initiated at a candidate's request. The matter was reviewed first by his department's Appointments Committee, and then by the College P & B Committee, the President, and the BHE. A favorable recommendation was usually required at each step to proceed to the next. The Geology Department Appointments Committee took no action on Dr. Kureshy's request, and the matter went no further.

While Dr. Kureshy was employed by SICC, only three candidates were considered by the College P & B for early tenure. Two failed to receive a favorable recommendation from the P & B Committee, and no motion was made in the committee to act on a third candidate who had been favorably recommended by the Geology Department Appointments Committee, effectively ending that application.

Of the two candidates the P & B Committee decided not to recommend, one, Bruce Chandler, Ph.D., had been a tenured associate professor at another university when SICC recruited him. When Chandler was hired as a full professor, he was promised that the Mathematics Department would recommend him for early tenure after two years of satisfactory service. Then-SICC President Dr. William Birenbaum overrode the College P & B's negative recommendation, and Dr. Chandler did receive early tenure. No other faculty member was awarded early tenure during Dr. Kureshy's period of employment at SICC.

*Compensation for Additional Teaching Hours*

In the fall of 1975, the regular teaching load was increased from twelve to fifteen hours a week. In the fall of 1976, however, Dr. Kureshy was assigned a total of eighteen hours. The added three hours consisted of a graduate level course in Earth Science offered at Richmond College, another CUNY unit. Dr. Kureshy was not paid for his increased classroom duties. His spring 1977 course load, however, was reduced to twelve hours to compensate for the fall overload. A memo from Dr. Benumof to Dean Roslyn Attinson dated September 10, 1976, indicates that monetary compensation was not among the three options Dr. Benumof considered.

Dr. Kureshy testified that he believed he would be paid for the additional teaching hours, as he believed SICC's practice to be. Prior to the Fall 1974 semester, SICC had various methods of compensating a professor who taught extra course hours, including additional pay or an offset in teaching hours in a subsequent semester. Increased budget constraints, however, caused the College to institute a policy of seeking alternatives other than financial compensation. Three professors had been compensated for teaching extra course hours in the Spring 1974 semester. With only one exception, however, from September 1974 through January 1978, no additional pay was given for extra course hours.

In the exceptional case, SICC paid Professor Ohan for his extra six-credit field course in the geology of New York City offered in the Spring 1977 semester. Professor Ohan carried a twenty-one credit course load that semester, and SICC concluded that this burden could not reasonably be handled by a reduction to nine credits the following semester.

*Tenure*

As previously noted, reappointment for a sixth year conferred tenure. Thus in 1976, Dr. Kureshy was automatically considered as a candidate for statutory tenure.

A tenure candidate sets the review process in motion by submitting his curriculum vitae to his Department Appointments Committee. After its review, that committee forwards the candidate's file and its own recommendation to the College P & B Committee. The P & B Committee holds a preliminary vote, engages in extensive discussions, and then conducts a final vote. If the P & B Committee votes to recommend a refusal of tenure, the candidate may appeal to an Appeals Committee, which was then comprised of three members elected by the faculty and three members appointed by the President. A recommendation to grant tenure by the P & B Committee or the outcome of the Appeals Committee process is next reviewed by the College President. The College President's decision must be accepted by the BHE for tenure to be awarded.

After consulting with Dr. Benumof, Dr. Kureshy submitted his curriculum vitae to the Appointments Committee for the Department of Physics, Geology and Astronomy, and was unanimously recommended for tenure. The preliminary vote in the P & B Committee, however, was against Dr. Kureshy, with four votes favoring tenure, ten against, and three abstentions. Nine positive votes were required to recommend tenure. Dr. Kureshy supplemented his curriculum vitae and, after lengthy debate, the P & B Committee recommended tenure by a one-vote margin.

In 1976 and 1977, SICC first federated and ultimately merged with Richmond College, forming the College of Staten Island ("CSI"), a named defendant. Edmund Volpe, Ph.D., also a defendant, had been President of Richmond College for two years and became President of the federated CSI in September 1976. Dr. Volpe, new to the SICC faculty, ultimately reviewed Dr. Kureshy's tenure application.

Based upon the contents of Dr. Kureshy's personnel file and a brief personal interview, Dr. Volpe decided to recommend that Dr. Kureshy be denied tenure. Dr. Kureshy was notified of Dr. Volpe's decision by letter dated October 28, 1976. Responding to a subsequent inquiry made by Dr. Kureshy, Dr. Volpe wrote that Dr. Kureshy's "overall teaching effectiveness is not of a quality to merit reappointment with tenure." Exhibit C–22. At trial, Dr. Volpe testified in detail concerning his decision.

Tenure decisions were to be made upon consideration of certain criteria articulated in the BHE By-Laws and an SICC policy memo. The by-law provided in pertinent part:

"1) The decision to grant tenure shall take into account institutional factors such as the capacity of the department or the college to renew itself, the development of new fields of study, and projections of student enrollment.

"2) The criteria upon which decisions to tenure are based shall be as follows:

"a) Teaching effectiveness—Tenure appointments shall be made only when there is clear evidence of the individual's ability and diligence as a teacher.

"b) Scholarship and Professional Growth—Evidence of new and creative work shall·be sought in the candidate's published research or in his instructional materials and techniques when they incorporate new ideas or scholarly research. . . .

"The following factors may be supplementary considerations in decisions on tenure. The weight accorded to each will vary from case to case.

"c) Service to the Institution . . . .

"d) Service to the Public . . . ."

Exhibit C–6 (footnotes omitted). The policy memo added:

"[T]he best possible persons should be sought and tenure should be recommended not on the basis of ability to meet minimum qualifications, but on a high standard of excellence and increasing usefulness as a teacher and scholar."

Exhibit C–5. Dr. Volpe testified that his review of Dr. Kureshy's file caused him to doubt Dr. Kureshy's effectiveness as a teacher, and that Dr. Kureshy's abilities in scholarship and service did not, in his mind, outweigh this deficiency.

Dr. Kureshy's file reflected the several techniques SICC utilized to evaluate its professors. Dr. Volpe testified as to how the information in each of these records affected his decision.

At trial, Dr. Volpe testified that his review of Dr. Kureshy's file focused first on the curriculum vitae prepared by Dr. Benumof. Under "Student Evaluation", that report stated:

"Students evaluate Professor Kureshy's teaching as approximately at the norm of the department. In particular, Professor Kureshy's ability to convey thoughts and stimulate interest has increased steadily during the years. Students presently consider him effective in these areas. With increased experience Professor Kureshy will probably continue to show a marked rise in his ratings. He responds well to students' suggestions and is very much interested in becoming an excellent teacher." Exhibit C–9.

On plaintiff's cross-examination, Dr. Benumof explained:

"This paragraph was written with the intention of presenting Dr. Kureshy as favorably as possible and yet consistent with the data that I had. So I had two objectives: One was not to prejudice his candidacy by saying something that other people might consider unfavorable, and yet I couldn't depart too widely from the data that I had." Transcript ("T"), Vol. II at 179.

Interpreting Dr. Benumof's statements on the curriculum vitae, Dr. Volpe described their role in his decision:

"I did ... study the vitae of the candidates and when it came to Kureshy, at that time, I was struck by the statement being made about teaching effectiveness, that the chairman was making which said that he might come up [to], or he almost approximated the norm. That struck me as a very strange statement, one that would be used to hide a possible problem. There was another one that he will become an effective teacher. He was there for five years. T. Vol. III at 25.

"... I had not observed Dr. Kureshy in the classroom, I had not even met Dr. Kureshy at this time. So, it was the vitae which first triggered questions in my mind, and I raised those questions at the P and B meeting, as was custom and right in that proceeding." T. Vol. III at 27.

Dr. Volpe participated in the P & B tenure review meeting in a nonvoting capacity. Discussions in that meeting revealed to Dr. Volpe that Dr. Kureshy's classroom effectiveness "was not a new subject, that it had been dealt with many times before, that those people who had been with the committee were quite familiar with the whole process or the whole question." Id.

Following the P & B meeting, Dr. Volpe reviewed Dr. Kureshy's entire file. His testimony at trial next addressed the comments made in peer evaluations. First, he noted that peer evaluations were not confidential, and that the professor who was reviewed would ultimately know who made what statements about him. For this reason, Dr. Volpe partially discredited peer evaluations as overly laudatory, and weighed heavily any negative comments they contained.

Peer evaluations assessing Dr. Kureshy's lectures contained suggestions that Dr. Kureshy make an effort to speak more clearly or slowly, that he experiment with more stimulating pedagogic techniques, and that he involve more students in class discussions. In light of Dr. Volpe's prior experiences with peer evaluations and his belief that they suffered from a tendency toward gratuitous praise, he concluded that "these were the kinds of statements that made me begin to doubt that [Dr. Kureshy] was sufficiently qualified as a teacher to receive a tenure of reappointment." T. Vol. III at 33.

Dr. Volpe next focused on the data compiled from student evaluation forms. Near the conclusion of each semester, SICC students completed questionnaires rating each professor's performance in eight specific categories on a five-point scale comprised of (1) exceptional, (2) above average, (3) aver-

age, (4) below average, and (5) poor. The eight categories sought the student's impressions of the professor's extent of subject knowledge, ability to convey thoughts, ability to stimulate interest, willingness to answer questions, promptness in grading, degree of fairness, concern for his students, and overall capability as an instructor. Copies of the computer summaries of student evaluations were provided to each professor, and the raw data on the original forms were retained for one year, available for further scrutiny if the professor desired.

Dr. Volpe testified that Dr. Kureshy's student evaluation results further alerted him to weaknesses in Dr. Kureshy's classroom effectiveness. Each semester's computerized compilations provided Dr. Kureshy's average score in each category alongside the norm scored in his department. Dr. Kureshy's scores were most commonly at or slightly below departmental norm, and when they exceeded the norm it was frequently by narrow fractions. At best, his student evaluations reflected an average but not exemplary record as a classroom teacher, arguably with a pattern of improvement from his first to his final year.

Certain categories, however, were highlighted by Dr. Volpe in explaining his concern. Dr. Kureshy was almost always below the norm, and often substantially so, in the categories concerning his ability to stimulate interest and in his overall rating, and he was always below the norm in the category addressing his ability to convey his thoughts. Dr. Volpe testified that this data made him question whether Dr. Kureshy could communicate effectively with his students. His concern was heightened by his prior experience with student evaluation forms, and his resultant belief that "students tend to be exceptionally generous in their appraisal of faculty.... They are ... much too overawed ... [and] they want to say good things about the faculty...." T. Vol. III at 19.

Also included in Dr. Kureshy's file was a letter signed by approximately twenty of the students in one of Dr. Kureshy's courses. Dr. Kureshy had been assigned to teach astronomy, a subject matter outside his immediate discipline, shortly before the Fall 1975 semester, when the professor scheduled to teach the course became unavailable. The students' protest letter, written early in the semester, complained about Dr. Kureshy's substitution as a professor for the course, stating:

"We, the undersigned students, of AS-TRO 100—5410, wish to make it known that we protest not having the instructor assigned to this course at the time of registration, and we feel that a complete understanding of the subject cannot be obtained because of a language barrier between the students and the present instructor." Exhibit D-30.

This petition was not shown to Dr. Kureshy. Instead, Dr. Benumof brought this matter to Dr. Kureshy's attention in a memo, available in Dr. Kureshy's file, which stated:

"I have received a protest signed by 20 of your students in Astronomy 100. They feel that your presentations are of little value to them because they do not understand your speech. I suggest that you make every effort to speak slowly and distinctly and that you invite students frequently to ask questions. It is very important that you obtain adequate feedback from your class to determine whether or not they are comprehending the material." *Id.*

Two memos responding to Dr. Benumof were also present in Dr. Kureshy's file. The first memo acknowledged Dr. Benumof's concern, but noted that only forty percent of the class signed the protest letter, and that Dr. Kureshy was doing his best in a "crisis" situation. Specific difficulties encountered by three students had been resolved, the memo stated. The second memo called attention to an attached note which resulted from a class discussion Dr. Kureshy conducted. The note stated:

"We the undersign [sic] in Ast. 100 # 5410 would like to say that our lecturer, Dr. Kureshy, is an excellent professor, considering that this subject is not his

main subject. The teacher is honest with us and his notes cover any language barrier." Exhibit P-41.

Although Dr. Volpe indicated that this incident in isolation would not necessarily be significant, he testified that he believed it to be part of a pattern of difficulties Dr. Kureshy encountered in communicating with his students.

The final evaluation method concerned with a professor's classroom skill was Dr. Kureshy's annual evaluations, prepared by Dr. Benumof. Dr. Volpe described how the comments listed under the heading "Teaching" on these five reports furthered his belief that Dr. Kureshy was not an effective teacher.

A department chairman at CUNY was elected by the faculty in his department, and Dr. Volpe believed that, as a result, he would feel "obligated ... to serve as an advocate of a candidate who has been voted in by his departmental committee ... [and to] attempt to balance honest appraisal with a stance that is laudatory." T. Vol. III at 18. Reading from Dr. Benumof's reports, Dr. Volpe testified that the repeated statements that student evaluations were "approximately at the norm of the department," coupled with the reserved compliments that Dr. Kureshy was a "conscientious" and "effective" teacher, indicated "that the chairperson is trying to be positive but is having problems dealing with the reality of the student evaluation report." T. Vol. III at 35.

Dr. Benumof confirmed in his testimony that he used the word "effective" as a synonym for "satisfactory." To describe superior classroom performance, Dr. Benumof stated, he would have written "outstanding," "superb," or "excellent." T. Vol. II at 55. His evaluations of Dr. Kureshy's classroom skills do not contain these or similar words. Nothing in the record indicates, however, that Dr. Benumof's appraisal of Dr. Kureshy was not based upon professional judgment. Dr. Benumof generally supported and encouraged Dr. Kureshy's career efforts, and was not shown to be biased against Dr. Kureshy.

Dr. Volpe routinely met with all tenure candidates. Addressing his interview with Dr. Kureshy, he testified:

"[I]t became very clear to me that the problems which had to be indicated in the student evaluations, in the record, in which there was a student protest registered ... at one time about communications, that there was a very serious communications problem." T. Vol. III at 29.

Dr. Kureshy's testimony at trial confirmed that he speaks English with a heavy accent.

Dr. Kureshy, whose specialty is micropaleontology, had published numerous articles and abstracts, had several additional articles and abstracts accepted for publication, had submitted papers which were accepted by international symposiums, and was engaged in continuous research and writing when he was considered for tenure. Some dispute was raised at trial over how accurately Dr. Kureshy's curriculum vitae reflected the status of these works and over whether all of the publications Dr. Kureshy placed in the file were still present when Dr. Volpe reviewed its contents.

Nevertheless, and despite Dr. Kureshy's repeated assertions to the contrary, Dr. Volpe's testimony demonstrates that he did consider Dr. Kureshy's scholarship and service contributions. On cross-examination, Dr. Volpe volunteered that he had read those publications which were included in Dr. Kureshy's file. Because his expertise was in English and in American literature, Dr. Volpe stated that he could not judge the value of Dr. Kureshy's contribution to the field of micropaleontology. Dr. Volpe detailed, however, the impact of Dr. Kureshy's scholarship on his tenure decision. He did not challenge Dr. Kureshy's contention that Dr. Kureshy had done good work, and that his publication record was noteworthy for a community college professor. He ultimately concluded, however, that Dr. Kureshy's scholarship abilities did not outweigh what Dr. Volpe viewed as a mediocre classroom performance.

In part, Dr. Volpe's testimony demonstrated that he was influenced by questions raised in the P & B Committee about Dr.

Kureshy's work. In its 1974 consideration of Dr. Kureshy for reappointment, the P & B Committee had questioned whether Dr. Kureshy was merely writing successive articles based upon prior research, or whether he was collecting new data. By letter dated October 24, 1974, Dr. Benumof had notified Dr. Kureshy about the committee's concerns "with regard to the extent of your scholarly activity" and Dr. Kureshy had replied by documenting his publication record. Essentially the same inquiry had been made of Professors Kaarsberg and Ohan.

Apparently, this correspondence was inadequate to resolve the doubts held by some members of the P & B Committee. Dr. Volpe testified that he heard discussion in the tenure review meeting regarding the currency of Dr. Kureshy's data and the continued need for additional research of Pakistani micropaleontology. He also read the letters concerning that matter contained in Dr. Kureshy's file.

Dr. Kureshy has argued that Dr. Volpe and Dr. Benumof both devalued his publications because his field of concentration was Indian and Pakistani geology and his publications appeared primarily in African, Middle Eastern and Asian journals. Nothing in either Dr. Volpe's or Dr. Benumof's testimony on direct or cross-examination or in any of the exhibits gives rise to even an inference of such bias. The record does reflect, however, that Dr. Kureshy was offered an opportunity to resolve any doubts about his scholarly activity by submitting his publications for review by an independent panel of geologists. He did not consent to this proposal. Additionally, although Dr. Kureshy's publications were admitted as evidence, nothing was offered at trial to demonstrate the quality of his work.

Although the record demonstrates that Dr. Kureshy was involved with various departmental activities and college committees, his record was not so unique or exemplary as to support an argument that it might outweigh a valid conclusion that he was less than an effective classroom teacher.

To disprove contentions that Dr. Volpe was more rigorous in his evaluation of Dr. Kureshy's tenure application than in his consideration of other professors' candidacies, Dr. Volpe next testified as to the factors he considered important in the twenty curriculum vitae and personnel files of other 1976 tenure candidates. His testimony both on direct and cross-examination supports his statement that:

"I went through the same process [as with Dr. Kureshy]. I was listening very carefully at the P and B meetings, the personnel files, the administrative files, looking for and reading the documents, if there were any publications, and to a good extent, I was trying to be as lenient as possible with these candidates unless serious doubts were being raised within the committee meeting or in my examination of the files." T. Vol. III at 43.

He noted that he was not limited in the number of professors who could be awarded tenure, and that he did not compare the candidates in any given year. He explained:

"I don't think you can do that. You are dealing with different disciplines and different backgrounds. Institutional need, for example, is an important consideration in granting statutory tenure, which means a lifetime commitment to a person on a particular discipline. That has to come into consideration. For some candidates, it is very important, for others it is not. Every candidate has to be considered on the basis of his record, his position within the college, his need within the whole process of fulfilling the mission of the institution, and I do not compare one with another." T. Vol. III at 43–44.

His testimony does reveal that, when evaluating professors who functioned primarily in administrative or counseling roles, he weighed fair or poor student evaluations less heavily than he did for Dr. Kureshy (*e.g.*, Roberta Vogel, counselor; J. Stanley Barlow, administrator; Felix Cardegna, provost). Similarly, he expected less in teaching effectiveness, scholarship, and ser-

vice from an assistant professor than from an associate professor (*e.g.,* Andrew Fuller). In marginal cases, he would consider scholarly achievement, and in less traditional fields, he valued accomplishments other than publication (*e.g.,* James Hladek, two patents relating to the field of mechanical technology; Charles Thomas, dance (Richmond College candidate)). He recognized departmental needs in some appointments (*e.g.,* Herbert Foster, black studies; Lynn Belaief, philosophy; Clarence Beninati, electrical technology; Thomas Bond, biology; Roberta Carey, economist (Richmond College candidate); George Rosos, interdisciplinary teaching (Richmond College candidate)), and some candidates simply had impressive records (*e.g.,* Sherman Heller, Joseph Albanese).

In three instances, Dr. Volpe recommended an award of tenure despite negative recommendations from the P & B Committee. In two, he believed that the Committee's actions reflected its concern that too many professors would be tenured in the nursing department. In all three, the Appeals Committee recommended tenure, and Dr. Volpe found that their records justified tenure grants.

Dr. Volpe also denied tenure in one instance because he did not believe the candidate was essential to her department (Margaret Diran, nursing), and in two instances because the candidates did not have outstanding teaching or scholarship records in a field crowded with highly qualified people (David Friedrichs and Colin Martendale, sociology).

Dr. Kureshy's peer and student evaluations for the 1976–1977 academic year apparently were more positive, and he continued to publish. He corresponded extensively with Dr. Volpe, calling this new information to his attention in the apparent hope of reversing the negative tenure decision. Dr. Volpe testified that such reconsideration was not his practice. Dr. Kureshy's recourse to the grievance procedure and the Equal Employment Opportunity Council were similarly unavailing.

*Discussion*

■ The standard for determining whether an employer has violated Title VII is well settled. First, a plaintiff must establish a *prima facie* case by documenting:

"(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted).

The *McDonnell Douglas* criteria are not rigid requirements, but are to be adapted to meet the specific job situation and employer decision. *See id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13; *e.g., Lieberman v. Gant,* 630 F.2d 60, 63 n. 3 (2d Cir.1980) (recognizing that when a college does not have a limited number of tenure slots, a showing that nonminority candidates were granted tenure may be sufficient). Thus the *prima facie* factors which must be demonstrated by plaintiff on each of his claims constitute an extrapolation of the four *McDonnell Douglas* criteria.

■ If a plaintiff establishes a *prima facie* Title VII case, the burden of proof shifts to the employer to articulate a nondiscriminatory reason for his challenged action. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The burden of persuasion, however, never leaves the plaintiff. *Id.* A defendant need prove neither his reliance on his nondiscriminatory motive nor the absence of a discriminatory intent. *Id.,* 101 S.Ct. at 1094. Rather, once the defendant has come forward with an explanation not grounded in impermissible discrimination, the plaintiff must persuasively show that the defendant's stated reasons are merely pretext concealing actual discrimination. *Id.,* 101 S.Ct. at 1095.

Plaintiff's color, religion, and national origin clearly place him within the classes of people protected by Title VII. *See, e.g.,*

Banerjee v. Board of Trustees of Smith College, 648 F.2d 61 (1st Cir.1981), cert. denied, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1982). Each of plaintiff's claims must be examined, however, under the remaining McDonnell Douglas criteria.

*Hiring and Salary*

Plaintiff was eventually hired and employed for five years as a professor at SICC and then CSI. Defendants thus do not seriously contend that he was not qualified for that position.

■ Plaintiff cannot, however, succeed on his claim that he was discriminatorily denied the position which was open in March 1971. That position had been filled before SICC received his application. Plaintiff argues that defendants were obligated to advertise more broadly and to make the position available for an extended period to attract minority candidates. This argument necessarily fails, however, because the very advertisement to which plaintiff responded had been published in a widely circulated professional journal at least two months before the position was filled. SICC's action was reasonable, especially since the "Bowker" funds provided for this position would have become unavailable unless it were filled promptly.

■ The need to expedite the hiring process also justified SICC's failure to consider plaintiff for the next two vacancies, which were filled in August 1971 and January 1972. Plaintiff did establish a *prima facie* case by showing that his application was still pending in SICC's files, that he was qualified, that he was not considered, and that other applicants were sought. In each instance, defendants explained that the semester was about to begin, and an instructor was needed immediately. While defendants may have been able to conduct a more thorough search, nothing in the record demonstrates that their explanation was pretext hiding a discriminatory intent.

In fact, plaintiff was hired over several other candidates for the next available position. It is hard to believe that defendants twice curtailed their job searches for discriminatory reasons only to recruit and hire a minority candidate for a third position.

Plaintiff was hired as an associate professor at the starting salary for that rank. Plaintiff attempted to show discrimination by pointing to other professors who began at higher salary levels. In each instance, however, the prior experience of the specific employee, the availability of unique and limited funds, or both, supported the increased compensation level. In contrast, the two professors hired in his department immediately prior to plaintiff, who were incidentally hired at the lower rank of associate professor, were also paid the starting salary for their rank. Defendants claim, and the record supports, that plaintiff was not offered a higher salary because his prior experience did not justify such deviation from the routine.

*Extra Hours*

■ Plaintiff was clearly compensated for his additional teaching hours in the Fall 1976 semester by an offset in his courseload in the Spring 1977 semester. To maintain his claim that he should instead have been paid for the additional time, he would have to show that he requested and was entitled to such compensation, and that others were compensated under similar circumstances. Plaintiff has not met this burden.

First, plaintiff has not shown that he asked to be paid, only that he assumed that he would be paid. Moreover, defendants demonstrated that the policy during the time that plaintiff carried a higher courseload was not to pay for these additional hours. Only once, and in clearly exceptional circumstances, did the College deviate from that policy. Otherwise, other professors who taught extra hours were compensated in the same manner as plaintiff, through an offset of decreased responsibilities during a later semester.

*Tenure, Early Tenure, and Promotion*

The tenure decision is uniquely important to an academic institution. When a college awards tenure, it makes a lifelong commitment of employment to a professor. Its tenured professors determine the nature

and quality of education at a school and define its reputation. *See Lieberman,* 630 F.2d at 64.

This Court cannot judge the academic validity of defendants' tenure decision. Its role is solely to determine whether that decision was not based on academic reasons, but instead grounded in discriminatory motives. *See, e.g., Banerjee,* 648 F.2d at 65; *Kunda v. Muhlenberg College,* 621 F.2d 532, 548 (3d Cir.1980).

The *McDonnell Douglas* standard requires a litigant to demonstrate that he was "qualified" for the position. To show that he is "qualified" for tenure, however, plaintiff must prove more than just that he is qualified for continued employment as a faculty member. *Lieberman,* 630 F.2d at 64; *but see Lynn v. Regents of the University of California,* 656 F.2d 1337, 1344 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982). SCI's tenure standards demanded "a high standard of excellence and increasing usefulness as a teacher and scholar." Additionally, BHE By-Laws and College officials repeatedly stressed that classroom performance was most significant to SCI's tenure decisions.

■ At most, plaintiff has demonstrated his competence as a teacher. He has not clearly shown, however, that he was qualified for tenure under SIC standards. Moreover, even if this Court were to find that plaintiff has proven his qualifications for tenure sufficiently to establish a *prima facie* case, defendants have adequately articulated legitimate reasons for this tenure denial, and plaintiff has not shown those reasons to be pretext. *See id.* at 1345.

Dr. Volpe's lengthy and detailed testimony described his method and standard for reaching tenure decisions. He carefully explained how, in his position as a College President, he weighed and interpreted the different data and reports available for his consideration.

Addressing plaintiff's case, Dr. Volpe expressed concern that plaintiff's difficulties with spoken English made him less effective as a teacher. He cited statements contained in plaintiff's curriculum vitae, peer observation reports, and annual evaluations, comments made in the P & B tenure review meeting, the documentation of the astronomy class protest, and his interview with plaintiff as the sources of his concern. His assertion that his evaluation was based upon academic consideration was corroborated by the exhibits documenting the data and reports he reviewed, by exhibits and testimony outlining College policy, and by other testimony. For example, Dr. Benumof stated that he intended his written evaluations to convey the meaning ascribed to them by Dr. Volpe.

Concededly, Dr. Volpe's analysis of the curriculum vitae and personnel records of other tenure candidates demonstrates that Dr. Volpe did alter his evaluation process according to whether a candidate was considered for higher or lower professorial rank, whether a candidate met a particular departmental need, whether the candidate filled a primarily non-teaching role, and for similar reasons. His evaluation of plaintiff, who was primarily a classroom instructor in a more traditional academic field, accordingly stressed teaching effectiveness and scholarly achievement. Nothing demonstrates, however, that Dr. Volpe's evaluation of plaintiff differed from the way any candidate in plaintiff's position would have been considered, or was altered because Dr. Volpe held some racial, religious, or ethnic bias. *See, e.g., Banerjee,* 648 F.2d at 66 & n. 10 (requiring higher academic credentials because more qualified professors were available than in previous years was a legitimate, nondiscriminatory motive); *Smith v. University of North Carolina,* 632 F.2d 316, 343 (4th Cir.1980) (consideration that plaintiff was a specialist unable to adapt to departmental needs for a generalist was a legitimate, nondiscriminatory motive).

At the least, defendants' asserted academic grounds for denying plaintiff tenure adequately rebut a *prima facie* Title VII claim. Arguably, Dr. Volpe's analysis of plaintiff's record defeats plaintiff's initial claim that he was qualified for tenure. For the same reasons, plaintiff's claim that his denial of early tenure violated Title VII must also fail.

Defendants contend that only exceptionally qualified professors were eligible for early tenure. Although plaintiff notes that the BHE By-Laws provided no express standard, the testimony of College officials showed that the practice was to require high qualifications. Moreover, the sole professor to receive early tenure during plaintiff's period of employment had been specially promised support for his early tenure application when he was hired. At best, plaintiff demonstrated that he may have been a marginal candidate for statutory tenure. He did not show that he possessed the high qualifications required for an award of early tenure.

Finally, plaintiff did not establish that he was qualified for promotion. Again, the standard for promotion to full professor required a record of "exceptional" achievement. At best, plaintiff demonstrated merely that he was a competent teacher and a prolific writer.

Defendants, moreover, cited plaintiff's length of service and lack of tenure as further legitimate grounds for rejecting plaintiff's promotion applications. Every associate professor promoted to full professor during plaintiff's period of employment had been awarded tenure at the associate professor rank, and had taught at SICC for more than five years prior to promotion. While longevity and seniority could not be the sole grounds for promotion, this Court finds nothing in the record to indicate that consideration of the length of service to SICC was mere pretext for a discriminatory intent.

Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 are controlled by the same standards applicable under Title VII, *see, e.g., Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir.1980), and therefore must also be denied.

Accordingly, plaintiff having failed to meet his burden of proof, defendants are entitled to judgment dismissing the complaint.

SO ORDERED.

The Clerk of Court is directed to enter judgment for defendants. The Clerk is further directed to forward copies of this Memorandum of Decision and Order to counsel for the parties.