**Sueyun PYO, Plaintiff,**

v.

**STOCKTON STATE COLLEGE, Defendant.**

**Civ. A. No. 84–0006.**

United States District Court, D. New Jersey.

March 11, 1985.

Sovel & Gruber by Stanley B. Gruber, Haddonfield, N.J., Freedman & Lorry, P.C., by Miriam L. Gafni, Philadelphia, Pa., for plaintiff.

Irwin I. Kimmelman, Atty. Gen. of N.J. by William Harla, Deputy Atty. Gen., Trenton, N.J., for defendant.

## OPINION

GERRY, District Judge.

This is a Title VII employment discrimination case. The plaintiff was an assistant professor in the Department of Art at Stockton State College. In December 1981, plaintiff was denied tenure by the college, and her employment was terminated. She alleges that the decision not to grant her tenure was the product of sex and/or race (Asian) discrimination. Among the relief sought by plaintiff is a judicial award of tenure. It is certainly within the court's

power to award tenure under appropriate circumstances.

The defendant is moving for partial summary judgment. The motion is a very limited one. The defendant merely seeks an order striking a judicial award of tenure as a possible remedy in this case. The defendant, in this motion, does not seek to argue whether or not the college's decision to deny tenure was discriminatory. The college's position is that even if the tenure decision was the product of discrimination, a judicial award of tenure, under the undisputed facts of the case, is still inappropriate. The appropriate remedy, the only appropriate remedy, for discrimination (if proved) is a "remand" back to the college for a *de novo* decision, it is argued. This relief is especially appropriate, it is stated, because all of the upper-level personnel who may have acted discriminatorily have since left the college. Thus, an impartial decision is said to be possible. The plaintiff takes the position that whether an award of tenure is an appropriate remedy is rather intimately intertwined with the question of whether there was, *in fact*, discrimination. If there was discrimination, it is argued, an award of tenure may be appropriate, although the appropriateness of the remedy would depend on, perhaps, the nature of the discrimination and the level of the decision-making process at which the discrimination occurred. The plaintiff urges that further discovery is thus necessary.

So, in essence, for the purposes of this motion, we may assume some discrimination, although this assumption itself is not one capable of precise definition under the complex circumstances of the tenure decision process. (This will presently become clearer.)

The tenure decision process is a multi-step process at Stockton State College. During their fifth consecutive year of employment with the college, faculty members are evaluated to determine if they should be reappointed with tenure. If tenure is denied, employment is generally ter-

minated. The first step in the process is for the faculty member to prepare a file in support of her application for tenure. The file may contain any material the candidate cares to submit above and beyond the required self-evaluation, faculty peer evaluations, and evaluations of students enrolled in the candidate's courses. Once the file is assembled, the second step is the review of the file by Faculty Review Committee of the division of the college in which the candidate is employed. The Faculty Review Committee of the Division of Arts and Humanities (plaintiff's division) was at all relevant times composed of five faculty members and five students. The dean of the division serves as chairperson but does not vote. After reviewing the file, the committee takes a vote on whether to recommend tenure.

The third step is the recommendation of the dean of the appropriate division. The dean's recommendation is based on the candidate's file and the recommendation of the Faculty Review Committee, as well as on his own independent evaluation of the candidate and the needs of the division. The fourth step is the submission of the candidate's file and the prior recommendations to the vice president of Academic Affairs. The vice president makes his own recommendation, based on the record below and the needs of the college, as he perceives them. The fifth step is the submission of the record below to the college president. If the president decides against tenure, that is the end of the matter. If the president decides to recommend tenure, then the matter is passed on to the college board of trustees for final decision.

In the present case, the plaintiff, as required, prepared a tenure file. The file contained 15 peer evaluations. According to the affidavits of the dean, vice president and president, 15 evaluations is a relatively low number: 30 are not uncommon. Moreover, plaintiff only submitted four letters from faculty outside her program, also allegedly a small number. Of the 15 evaluations, 11, recommending tenure, were very positive (making reference, e.g., to plaintiff's talent as a sculptor, her strong teach-

ing ability, and her contributions to the revitalization of the Art Department); two, although positive, declined to take a position due to insufficient opportunity to observe; and two were negative. Of these, one (Lemakis) faults plaintiff for lack of self-confidence, leadership and service to the college. The other (Metcalf) faults plaintiff for failing to honor a commitment to put on a show of her work at the college art gallery, and for being inaccessible and more demanding of students than she was of herself. The student evaluations (statistical summaries of responses of students to plaintiff's courses) were slightly below average: the median score is allegedly 5.5–5.6 (1–7 scale), whereas plaintiff's average score was 5.3. The court is not sure the statistics exactly equate with each other, however.

Based on the tenure file, the Faculty Review Committee voted to recommend tenure, by a vote of 7 in favor, 2 opposed, and 1 abstention. According to affidavits, this was no more than lukewarm support.

The dean of plaintiff's division, Martin Jones, recommended *against* tenure. Although Jones had nice things to say about Ms. Pyo, he mentioned her failure to put on the aforementioned solo show as "disappointing," and found her to lack leadership or college service potential. Vice President Nanzetta recommended against tenure as well, in a very cursory manner, relying on the "mixed reviews" of the Faculty Review Committee and the negative recommendation of the dean. The president followed the recommendations of the dean and vice president and decided not to recommend Pyo for tenure to the Board of Trustees. Thus, plaintiff was not reappointed to the faculty of the college.

At three of the four levels, the recommendation was to deny tenure, and support for tenure in plaintiff's file and at the committee level was less than unanimous. Certainly, there are no indications *on the face* of any of the evidence to suggest discrimination. For the purposes of this motion, discrimination is assumed, how-

ever. Does this mean discrimination is assumed at *all* levels, including among the students whose comments furnished the basis for statistical summaries?

*Analysis.*

**■** 1. When Title VII was enacted in 1964, Congress exempted educational institution employees engaged in educational activities from the statute's requirements. Not until 1972 did Congress extend Title VII to higher educational institutions. The legislative history could not be clearer that Congress was concerned with discrimination in university settings. The House Committee Report states:

> Discrimination against minorities and women in the field of education is as pervasive as discrimination in any other area of employment.

> The committee feels that discrimination in educational institutions is especially critical. The committee cannot imagine a more sensitive area.... To permit discrimination here, more than in any other area, would tend to promote misconceptions leading to future patterns of discrimination.

1972 U.S.C.C.A.N. 2137, 2155. Thus, Title VII now clearly applies to the hiring and employment policies and decisions of universities, including the decision to grant tenure. Since the central purpose of Title VII is to make persons whole for the harm suffered on account of unlawful employment discrimination, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975); a judicial award of tenure is, under appropriate circumstances—where an award would make one whole, rather than act as a windfall—certainly a possibility. *See Kunda v. Muhlenberg College*, 621 F.2d 532 (3d Cir.1980) (upholding a conditional award of tenure).

2. Courts have struggled, however, with the application of Title VII to the academic setting and, more often than not, have undertaken no more than a deferential review of tenure decisions, in contrast to the rather aggressive review of employment decisions involving blue collar workers. While the cases pay much lip service

to the goal of eradicating employment discrimination, wherever found, they are also replete with language to the effect that courts are not to serve as "super tenure committees." *See, e.g., Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1354 (W.D.Pa.1977); *Keddie v. Pennsylvania State University*, 412 F.Supp. 1264 (M.D. Pa.1976); *Faro v. New York University*, 502 F.2d 1229 (2d Cir.1974). Courts, seldom having made a factual finding of discrimination, have almost never had to reach the question of appropriate remedies. Even the *Kunda* court, which upheld a finding of discrimination and a conditional tenure remedy, stated:

> [I]t is beyond cavil that generally faculty employment decisions comprehend discretionary academic determinations which do entail review of the intellectual work product of the candidate. That decision is most effectively made within the university

> .   .   .   .   .   .

> Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, *and unless they can be shown to have been used as a mechanism to obscure discrimination*, they must be left for evaluation by the professionals....

621 F.2d at 547–48 (emphasis added). The Second Circuit has recently elaborated on why tenure decisions are so difficult for a court to become involved in. Tenure decisions, the court stated, entail lifetime commitments in terms of salary and interpersonal relationships; they are often noncompetitive, in the sense that one candidate is not always or necessarily chosen over another: in some years, or within some divisions, no candidate may be granted tenure, or all candidates may be granted tenure; decisions are often decentralized and

may involve as well many levels of decision-making; they involve an unusually large mix of factors, from the subjective qualities of the candidate to institutional priorities having nothing to do with the candidate; and finally, tenure decisions are a source of unusually great disagreement for decision-makers. Moreover, because of all these factors, statistical evidence may be less useful to the plaintiff than in other contexts. *See Zahorik v. Cornell University,* 729 F.2d 85 (2d Cir.1984). Of course, not all of these factors are equally significant in all cases. For example, in the instant case, the evidence thus far does not indicate that institutional factors unrelated to Ms. Pyo entered into the decision.[1] Commentators have additionally questioned whether tenure decisions, involving lifetime commitments, are really in a class by themselves. *See* Bartholet, "Application of Title VII to Jobs in High Places," 95 Harvard Law Review 947 (1982); *cf. Hishon v. King & Spalding,* —— U.S. ——, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (holding Title VII applicable to law firm partnership decisions).[2]

3. The court is thus faced with the dual obligation of faithfully upholding the goal of Title VII of making the plaintiff whole, while also exercising proper restraint and deference with regard to university officials. The defendant urges that in the instant case a proper balancing of these obligations requires that the court stop short of awarding plaintiff tenure, even if discrimination is found to have infected the tenure decision as to the plaintiff. As an initial matter in support of this argument, the defendant cites a good many cases in which courts, when faced with facts comparable to those here, have refused to award

tenure. However, *none* of these cases are applicable to the instant case, because the courts ruled that plaintiffs did not prove discrimination. Thus, the courts never reached the question of whether the granting of tenure was appropriate relief. *See, e.g., Powell v. Syracuse University,* 580 F.2d 1150 (2d Cir.1978); *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328 (W.D.Pa.1977); *Faro v. New York University,* 502 F.2d 1229 (2d Cir.1974); *Hooker v. Tufts University,* 581 F.Supp. 104 (D.Mass. 1983); *Kureshy v. City University of New York,* 561 F.Supp. 1098, 1110 (E.D.N.Y. 1983); *Johnson v. Michigan State University,* 547 F.Supp. 429 (W.D.Mich.1982); *Meehan v. New England School of Law,* 522 F.Supp. 484 (D.Mass.1981); *cf., Duke v. North Texas State University,* 469 F.2d 829 (5th Cir.1972) (First Amendment case; college successfully articulated constitutional reasons for termination of professor's employment). These cases are therefore of limited usefulness to a defendant who, for the purposes of this motion, is conceding discrimination.

4. The defendant next argues that the Third Circuit's decision in *Kunda v. Muhlenberg College, supra,* mandates that we strike the plaintiff's demand for a judicial award of tenure. In *Kunda,* the court was presented with an unusual situation in which the plaintiff's "achievements, qualifications, and prospects were not in dispute." Everyone who evaluated her thought she was qualified to be granted tenure. The only reason tenure was denied was because she lacked a master's degree. The evidence disclosed, however, that unlike her male counterparts, the plaintiff was never informed that she needed a master's de-

---

1. This may mean, simply, that had plaintiff been deemed "qualified," tenure would have been awarded. Or it may mean that the decision-makers, not believing plaintiff qualified, did not have to reach the question of whether other reasons nevertheless justified the denial of tenure.

2. It is interesting to note that the Third Circuit, while acknowledging the problems of a court's delving too deeply into academic employment decisions, may not attach the same significance to the lifetime commitment problem as the Sec-

ond Circuit. The *Kunda* decision, in discussing the desirability of deference, discusses *promotion* and tenure in the same breath. 621 F.2d at 548. Promotion may involve a change from one non-tenured position to another, or from one tenured position to another. Thus, it may be reasonable to infer that it is the subjective and esoteric aspects of the decision-making process, rather than the long-term consequences of the decision, that are of greatest concern to the Third Circuit.

gree. This purposeful discrimination, the Third Circuit held, justified the relief granted: an award of tenure if, within two years, the plaintiff successfully obtained a master's degree. In *Kunda,* then, the court was not required to make an independent judgment of plaintiff's qualifications. All university officials were themselves in agreement as to plaintiff's suitability, and the court, finding that plaintiff would have earned a master's degree but for the withholding of advice (a sort of procedural irregularity), deemed the tenure remedy the appropriate means to make plaintiff whole.

The defendant asks this court to read *Kunda* for the proposition that where there are disputes in the university as to a teacher's qualifications (and especially, as here, where negative recommendations abound), the court must not "overrule" the university and award tenure.[3]

This court does not believe *Kunda* necessarily proscribes it from awarding plaintiff tenure merely because officials at Stockton State College disagree about her worth. The *Kunda* court most definitely stated that courts ordinarily should not intrude upon institutional evaluations. But this statement is not phrased in absolute terms. To repeat a passage previously quoted:

> Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and *unless they can be shown to have been used as a mechanism to obscure discrimination,* they must be left for evaluation by the professionals. . . .

621 F.2d at 548. This passage at the least suggests that if the plaintiff can demon-strate that facially neutral evaluations mask bias, then the court is not without the power to conduct its own evaluation. Insofar as the defendant *arguendo* concedes discrimination, this may be appropriate judicial behavior here.

At this point, however, it may be useful to consider the various points at which discrimination might enter into the decision-making process, as well as the different types of discrimination, and consider the appropriate judicial response to such discrimination.

*Kunda* teaches that where a candidate's qualifications are undisputed and discrimination is the apparent reason that tenure was denied, a court may award tenure (subject to any appropriate conditions); but that where one's qualifications are in doubt, the court generally should not perform its own evaluation.

But there may be cases where a plaintiff can demonstrate that others with the same or very similar evaluations (i.e., qualifications) were granted tenure. If others with "lukewarm" evaluations (like plaintiff's) were nevertheless granted tenure, then it *may* be appropriate for the court to grant plaintiff tenure.[4] We say "may" because the college may yet be able to show factors unrelated to plaintiff which justify the disparate treatment. But in a case as described above, the court is not necessarily called upon to perform its own independent evaluation but, taking the evaluations at face value (i.e., assuming their sincerity and lack of bias), in granting tenure may merely be doing what is necessary to make

**3.** In support of this reading of *Kunda,* defendant cites *Gurmankin v. Costanzo,* 626 F.2d 1115 (3d Cir.1980). In the latter case, the Third Circuit merely held that a lower court's refusal to award tenure was an appropriate exercise of discretion, where the school district had not yet been given an opportunity to evaluate plaintiff's qualifications and performance as a teacher. *Gurmankin* cannot be read to rule out a judicial award of tenure in a case where decision-makers disagree but only counsels the court against acting prematurely and thereby risking the possibility of placing plaintiff in a better position than she would have been in, but for the discrimination.

**4.** For example, the plaintiff may be able to demonstrate that other faculty with similar tenure files (peer and student evaluations) received the unanimous support of the Faculty Review Committee; or that other faculty with similar tenure files and mixed votes from the committee nevertheless received a positive recommendation from the dean; or that other faculty with similar files and mixed recommendations were nevertheless supported for tenure by the vice president, etc.

plaintiff whole. In such a case, the discrimination and the relief requested (tenure) are intimately intertwined: the discrimination *is* the denial of tenure (or the decision not to recommend tenure) where others, similarly evaluated, have been granted tenure. Therefore, if this type of discrimination is shown, an award of tenure may be the appropriate relief.[5]

On the other hand, the evidence may demonstrate that faculty members with evaluations the same or very similar to Ms. Pyo's were not given tenure either. But plaintiff might prove that the evaluations of her qualifications were not sincere, but were the product of discrimination. In such a situation, if the court were to award tenure, it might be doing more than making the plaintiff whole. Although *Kunda* does not rule out an independent evaluation by the court under the circumstances hypothesized, neither does it suggest that the court could not resort to less extreme relief, especially if the court were satisfied that an unbiased evaluation were possible. Thus, it might be better in this situation for the court to "remand" for a *de novo* evaluation.

All this discussion is intended to illustrate is that "discrimination" in the tenure process is not a simple concept. Depending on the type of discrimination (the substantive evaluation of a candidate's merits versus the decision on how to treat one with a particular set of evaluations) and the level at which the discrimination occurred, a judicial award of tenure may or may not be appropriate. Since, in this case, the "discrimination" has not been clearly defined by the defendant, the court cannot rule out an award of tenure, and the motion will be denied.

The court, of course, expresses no opinion regarding the merits of plaintiff's case. Further discovery on discrimination, as relevant to the relief sought, is clearly appropriate, however. Defendant's attorney shall prepare an appropriate order consistent with this opinion.

---

5. Again, however, the relief may depend on the level of the tenure process at which the discriminatory decision or recommendation was made. The earlier in the process the discrimination occurred, the more speculative a determination would seem to be that later decision-makers, but for the discrimination, would have acted differently.